UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CHRISTOPHER BRADY, Individually and
on Behalf of All Others Similarly Situated,

                  Plaintiff,

                -against-

TOP SHIPS INC., EVANGELOS J. PISTOLIS,
ALEXANDROS TSIRIKOS, KALANI
INVESTMENTS LIMITED, MURCHINSON
LTD., MARC BISTRICER and XANTHE
HOLDINGS LTD.,

                  Defendants.

------------------------------------------------------------x

:  Civil Action No.: 2:17-cv-04987-JFB-SIL

**Oral Argument Requested**


# MEMORANDUM OF LAW IN SUPPORT OF XANTHE HOLDINGS LTD., KALANI INVESTMENTS LTD., MURCHINSON LTD., AND MARC BISTRICER'S MOTION TO DISMISS


SCHULTE ROTH & ZABEL LLP

Peter H. White (admitted *pro hac vice*)
Noah N. Gillespie
Jeremy Bachrach Siegfried

901 15th Street NW, Suite 800
Washington, D.C. 20005
(202) 729-7470

*Attorneys for Xanthe Holdings Ltd., Kalani Investments Ltd., Murchinson Ltd., and Marc Bistricer.*

## <u>TABLE OF CONTENTS</u>

**Page**

Preliminary Statement ..................................................................................................1

Statement of Facts .......................................................................................................2

    The Parties .............................................................................................................2

    Top Ships Warned of Dilution and Reverse Splits Long Before the Class Period ..............3

    Top Ships Obtained Similar Financing Before Xanthe and Kalani .....................................5

    The Common Stock Kalani Agreed to Purchase .................................................................6

    The Convertible Preferred Stock Xanthe Purchased ..........................................................7

    The Promissory Notes Kalani and Xanthe Purchased ........................................................8

    Top Ships Obtained Similar Financing After Xanthe and Kalani ......................................10

Argument .........................................................................................................................10

    I. The Amended Complaint Fails to State a Claim Against Xanthe or Kalani .................11

        A.    Plaintiffs' Section 10(b) Securities Fraud Claim Fails .............................12

            1.    Plaintiffs state no claim under Rule 10b-5(b) because they allege no misstatement or omission Xanthe or Kalani "made" .....12

            2.    Plaintiffs state no claim under Rules 10b-5(a) or (c) because they allege no scheme beyond the purported misstatements or omissions ..................................................................................14

            3.    Plaintiffs cannot show economic loss or loss causation ...............15

            4.    Plaintiffs cannot show reliance ....................................................16

        B.    Plaintiffs' Market Manipulation Claims Also Fail ...................................17

        C.    Plaintiffs' Novel Insider Trading Claim Fails ...........................................19

        D.    Plaintiffs Fall Short of the "Compelling" Showing of Scienter that Rule 9(b) and the PSLRA Require for Each of Plaintiffs' Claims ...........20

i

II. Plaintiffs' Conclusory Pleading Regarding Murchinson and Bistricer Does Not Meet the Standard Required of Private Securities Class Action Plaintiffs ............22

    A.    Plaintiffs' Minimal Allegations Against Murchinson and Bistricer Cannot Establish Primary Liability ............................................................23

        1.    Section 10(b) offers no private right of action for secondary liability ............................................................................................23

        2.    Plaintiffs' claims against Murchinson and Bistricer under Sections 9, 10(b), and 20A fail ........................................................23

    B.    Neither Murchinson nor Bistricer Has Control Person Liability for Xanthe or Kalani's Actions ........................................................................24

III. The Court Lacks Personal Jurisdiction over Murchinson and Bistricer .....................25

IV. Plaintiffs Have Not Properly Served Xanthe or Kalani .............................................26

Conclusion ..............................................................................................................................28

## **TABLE OF AUTHORITIES**

**<u>Cases</u>**                                                                                                                           **<u>Page(s)</u>**

*Afloat in France, Inc. v. Bancroft Cruises Ltd.*,
  2003 WL 22400213 (S.D.N.Y. Oct. 21, 2003) .......................................................................26

*Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*,
  2007 WL 2077153 (S.D.N.Y. July 20, 2007) .........................................................................20

*Anschutz Corp. v. Merrill Lynch & Co., Inc.*,
  690 F.3d 98 (2d Cir. 2012)............................................................................................11, 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................16, 18, 19, 24

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)................................................................................................................17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................11

*Bennett v. U.S. Trust Co. of New York*,
  770 F.2d 308 (2d Cir. 1985).....................................................................................................3

*Brockmeyer v. May*,
  383 F.3d 798 (9th Cir. 2004) .................................................................................................28

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985)................................................................................................................25

*In re Canandaigua Sec. Litig.*,
  944 F. Supp. 1202 (S.D.N.Y. 1996)......................................................................................20

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994)................................................................................................................23

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010)....................................................................................24

*In re Coudert Bros. LLP*,
  2017 WL 1944162 (S.D.N.Y. May 10, 2017) .......................................................................28

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)................................................................................................................26

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................12, 15, 16

*Dynegy Midstream Servs., LP v. Trammochem*,
    451 F.3d 89 (2d Cir. 2006)..............................................................................26

*ECD Investor Grp. v. Credit Suisse Int'l*,
    2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017).................................................17

*Feiner Family Trust v. VBI Corp.*,
    352 F. App'x 461 (2d Cir. 2009) ....................................................................20

*Freedom Watch v. Org. of the Petroleum Exporting Countries*,
    766 F.3d 74 (D.C. Cir. 2014) ..........................................................................26

*Glazer v. Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992)............................................................................14

*Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,
    817 A.2d 160 (Del. 2002) ................................................................................4

*Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*,
    988 F.2d 476 (3d Cir. 1993)............................................................................27

*Gruber v. Gilbertson*,
    2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ...............................................20

*J. McIntyre Mach., Ltd. v. Nicastro*,
    131 S. Ct. 2780 (2011)....................................................................................25

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)..................................................................................12, 23

*JGB (Cayman) Newton, Ltd. v. Sellas Life Sciences Grp. Inc.*,
    2018 WL 5266877 (S.D.N.Y. Oct. 23, 2018) .................................................4

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................21

*In re KeySpan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...........................................................20

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991)........................................................................................20

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................14

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996) ........................................................................25

*Mullane v. Cent. Hannover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ...................................................................................26

*Musick, Peeler & Garrett v. Emp'rs Ins. of Wausau*,
    508 U.S. 286 (1993) ...................................................................................20

*Next Level Commc'ns, Inc. v. Motorola, Inc.*,
    834 A.2d 828 (Del. Ch. 2003) ......................................................................4

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ........................................................................21

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ........................................................................16

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ..........................................................20

*Pearson Educ., Inc. v. Kumar*,
    721 F. Supp. 2d 166 (D. Conn. 2010) ...........................................................25

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004) ..........................................................25

*Prime Movers Capital Partners LP v. Elixir Gaming Techs., Inc.*,
    761 F. Supp. 2d 103 (S.D.N.Y. 2011) ..........................................................26

*Reiss v. Fin. Performance Corp.*,
    764 N.E.2d 958 (N.Y. 2001) ..........................................................................4

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................................11

*Salvani v. ADVFN plc*,
    50 F. Supp. 3d 459 (S.D.N.Y. 2014) ............................................................17

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) ..........................................................14

*SEC v. KPMG LLP*,
    412 F. Supp. 2d 349 (S.D.N.Y. 2006) ..........................................................15

*SEC v. Lucent Techs., Inc.*,
    610 F. Supp. 2d 342 (D.N.J. 2009) ..............................................................14

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012)..........................................................................20

*SEC v. U.S. Envtl., Inc.*,
    155 F.3d 107 (2d Cir. 1998)....................................................................18, 23

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990)........................................................................25

*Shemian v. Research in Motion Ltd.*,
    570 F. App'x 32 (2d Cir. 2014) ....................................................................21

*Silver v. N.Y. Stock Exchange*,
    373 U.S. 341 (1963)........................................................................................4

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..........................................................................16, 17, 23

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................20, 24

*Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd.*,
    106 F.R.D. 595 (E.D. Mo. 1985) ..................................................................28

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
    2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005)................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................21

*Thomas & Thomas Rodmakers, Inc. v. Sharpe's, Inc.*,
    2007 WL 1057382 (S.D. Ohio Apr. 5, 2007) ...............................................28

*Volkswagenwerk AG v. Beech Aircraft Corp.*,
    751 F.2d 117 (2d Cir. 1984)..........................................................................26

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
    486 U.S. 694. (1988)......................................................................................27

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)............................................................20

*Walden v. Fiore*,
    571 U.S. 277 (2014)......................................................................................25

*Water Splash, Inc. v. Menon*,
    137 S. Ct. 1504 (2017)...................................................................................27

*Weinstein v. Cardis Enters. Int'l N.V.*,
　284 F. Supp. 3d 240 (E.D.N.Y. 2017) ...................................................................23

*West v. Terry Bicycles, Inc.*,
　230 F.3d 1382 (Fed. Cir. 2000)...........................................................................27

*Wilson v. Merrill Lynch & Co.*,
　671 F.3d 120 (2d Cir. 2011)...............................................................18, 19, 23

*Youngers v. Virtus Inv. Partners Inc.*,
　195 F. Supp. 3d 499 (S.D.N.Y. 2016)..................................................................24

**Statutes**

15 U.S.C. § 78i(a)(2)...............................................................................................17

15 U.S.C. § 78i(a)(4)...............................................................................................17

15 U.S.C. § 78t-1 ..............................................................................................19, 20

15 U.S.C. § 78u–4(b)(1) .........................................................................................12

15 U.S.C. § 78u–4(b)(2) ....................................................................................12, 21

**Other Authorities**

Fed. R. Civ. P. 4(f)............................................................................................26, 27

Fed. R. Civ. P. 4(h)(2).............................................................................................26

Fed. R. Civ. P. 9(b) .....................................................................................11, 20, 21

Convention on the Service Abroad of Judicial and Extrajudicial
　Documents in Civil or Commercial Matters, Nov. 15, 1965,
　20 U.S.T. 361, 658 U.N.T.S. 164........................................................................27

Defendants Xanthe Holdings Ltd. ("Xanthe"), Kalani Investments Ltd. ("Kalani"), Murchinson Ltd. ("Murchinson"), and Marc Bistricer ("Bistricer") move to dismiss all claims against them in the Amended Complaint. Dkt. 68 ("AC"). All of these Defendants move under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Additionally, Murchinson and Bistricer move under Rule 12(b)(2) for lack of personal jurisdiction; and Xanthe and Kalani move under Rule 12(b)(5) for insufficient service of process.

## **Preliminary Statement**

In late 2016, Defendant Top Ships Inc. ("Top Ships") announced it would seek financing to run its business by issuing securities, including $200 million in new common stock. Plaintiffs filed this action in 2017, complaining that Top Ships did just what it disclosed it would do, even though it stopped after raising just $100 million from Defendants Kalani and Xanthe and two entities against whom Plaintiffs have not made claims: Yorkville and Crede.

Top Ships received Yorkville's financing before any financing from Kalani or Xanthe; and Top Ships received Crede's financing after Kalani and Xanthe had completed their financing arrangements. Just as Plaintiffs have no claim against Yorkville or Crede based on those financings, they likewise have no claim against Kalani and Xanthe for their financing to Top Ships on terms at least as favorable as the Yorkville and Crede arrangements.

Top Ships regularly updated the investing public about all of these developments and fully disclosed each agreement as it was executed. The Amended Complaint itself emphatically demonstrates the thoroughness of these disclosures—nearly every factual allegation in the Amended Complaint is drawn from contemporaneous Top Ships announcements, including the features of the agreements Plaintiffs now allege were hidden.

Neither Kalani nor Xanthe participated in any way in any of Top Ships' corporate decisions. The Amended Complaint does not allege that either of them helped decide whether

1

and when to conduct reverse stock splits; what Top Ships should disclose to its investors; or how Top Ships chose to spend the money it raised through these and other financing transactions.

Further, the Amended Complaint barely mentions Murchinson or Bistricer at all. The only allegation about them is that they "owned and controlled" Kalani and Xanthe. This bare allegation does not satisfy the plausibility standard applicable to all civil actions, let alone the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which govern each and every claim Plaintiffs assert. Moreover, the Amended Complaint fails to establish that Murchinson or Bistricer, who are Canadian, have sufficient suit-related contacts with this forum to support exercising personal jurisdiction over either of them.

Additionally, Plaintiffs have failed to show that they have properly served Kalani and Xanthe consistent with Rule 4(f) and the applicable international agreements.

For these and all of the following reasons, the Court should dismiss all claims against Xanthe, Kalani, Murchinson, and Bistricer with prejudice.

## Statement of Facts

**The Parties**

Xanthe and Kalani are companies based in the British Virgin Islands ("BVI") that provided financing to Top Ships through several financing arrangements that Top Ships fully disclosed to the investing public, described below. *See* AC ¶¶ 7-8, 21, 33-34. Xanthe owns Kalani, and is in turn owned by a nonparty. Dkt. 86-87. The Amended Complaint often confusingly refers to "Kalani" regardless of which parties were actually involved.

Plaintiffs provide minimal factual detail about Murchinson and Bistricer. Plaintiffs allege only that they "owned and controlled" Kalani and Xanthe, which is a bald legal conclusion without any factual basis. AC ¶ 2. Bistricer is "reportedly the head of Murchinson," and Murchinson is an investment adviser in Toronto. AC ¶¶ 35-36. Plaintiffs credit

2

"investigative reporting" for these allegations, but do not cite any source.  *See* AC ¶¶ 36, 73.

Plaintiffs fail to identify a single act or statement by either Murchinson or Bistricer at any point

in the proposed class period.

Top Ships is a public company whose common stock trades on NASDAQ.  AC

¶ 30.  It is incorporated in the Republic of the Marshall Islands, has its principal place of business

in Greece, and it "owns and operates tanker vessels" that transport "oil and petroleum products

and bulk liquid chemicals."  AC ¶¶ 3, 30, 39.  Starting in 2016, the shipping industry suffered a

major downturn.  *See* Ex. A at 7-10.[1]  The downturn increased volatility in the shipping market,

and caused companies like Top Ships to lose access to traditional capital markets.  *Id.* at 13.

Plaintiffs claim to be representatives of a class of persons "who purchased or

otherwise acquired Top Ships common stock between November 23, 2016 and April 3, 2018,"

which is the proposed class period.  AC ¶ 1.  Plaintiffs also seek to represent persons "who

owned shares negatively impacted by Defendants' manipulative scheme," AC ¶ 301, even

though it is well-settled that loss allegations alone are insufficient to support such a claim.  *See*

*Bennett v. U.S. Trust Co. of New York*, 770 F.2d 308, 313-314 (2d Cir. 1985) (holding that

allegations of loss alone were insufficient to support Section 10(b) and Rule 10b-5 claims).

**Top Ships Warned of Dilution and Reverse Splits Long Before the Class Period**

Much of the conduct recited in the Amended Complaint had been going on for a

long time before the proposed class period.  For example, throughout the proposed class period,

Top Ships warrants remained outstanding that, if exercised, would have further diluted Top

Ships stock.  Top Ships issued these warrants in 2014 in order to raise approximately $20

---

[1]       "Ex." refers to the exhibits to the Declaration of Noah N. Gillespie in Support of Xanthe Holdings Ltd.,
Kalani Investments Ltd., Murchinson Ltd. and Marc Bistricer's Motion to Dismiss filed herewith.

million.  By their terms, the warrants entitled their holders to obtain far greater numbers of shares at far lower prices the more that Top Ships issued new stock, including the types of deals Top Ships entered into with Yorkville, Kalani, Xanthe, and Crede.  *See* Ex. A at 29-35; Ex. B.  Top Ships referred to the 2014 warrants as it entered into these new financing arrangements, making sure the public took note of this risk of dilution.  *E.g.*, Ex. C at 65.

The volatility and precarious financial condition of Top Ships was also well-known prior to the beginning of the proposed class period.  For example, Top Ships had previously been listed on the NASDAQ Global Select Market but downgraded itself to the NASDAQ Capital Market when it could not comply with the Global Select Market's more stringent requirements.  *E.g.*, Ex. D at 8.

Top Ships had also conducted reverse splits before the proposed class period with shareholder approval, in order to maintain compliance with NASDAQ minimum share price requirements to remain publicly listed.   Ex. A at 27, 32-35.  A reverse split is a common corporate action that replaces a set number of existing shares with a single proportionately more valuable share, so that while the *price* of the new share is that much higher, the *value* of each shareholder's holdings does not change.  AC ¶ 69; *see, e.g.*, *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 959-61 (N.Y. 2001); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 165 n.2 (Del. 2002); *JGB (Cayman) Newton, Ltd. v. Sellas Life Sciences Grp. Inc.*, 2018 WL 5266877, at *3 n.7 (S.D.N.Y. Oct. 23, 2018).  Corporations commonly conduct reverse splits to remain listed on a national exchange, and thereby avoid having to trade "over the counter" where shareholders wishing to sell may not be able to locate a willing buyer.  *Silver v. N.Y. Stock Exchange*, 373 U.S. 341, 348 (1963) (describing over-the-counter markets); *Next*

*Level Commc'ns, Inc. v. Motorola, Inc.*, 834 A.2d 828, 855 (Del. Ch. 2003) (splits "have little or no effect on [shareholder's] investment in [the company]").

**Top Ships Obtained Similar Financing Before Xanthe and Kalani**

The proposed class period began on November 23, 2016, when Top Ships publicly disclosed agreements with Yorkville for up to $3 million in exchange for new common stock. AC ¶¶ 1, 81; Ex. C. The documents explained that Yorkville would conduct up to three different closings, the last of which depended on whether the SEC ultimately approved further shares.

Towards that end, Top Ships filed a registration statement including a base prospectus that disclosed Top Ships' desire to issue up to $200 million in new shares of common stock. AC ¶ 5. Although Top Ships amended the draft registration statement adjusting the amount of other securities it might issue, every version uniformly announced that Top Ships planned to issue up to $200 million in new common stock. AC ¶¶ 79-80; Ex. E. Top Ships and Yorkville ultimately decided to "cancel" the third closing, reducing the total deal from $3 million to $2 million on January 9, 2017. AC ¶¶ 5, 67, 79-81, 155-156; Ex. E; Ex. F.

The SEC reviewed this registration statement and declared it effective on February 1, 2017. AC ¶ 7; Ex. G. Yorkville had purchased $2 million in convertible preferred shares in November 2016, and exercised them over time throughout 2017. AC ¶ 125; Ex. A at 34. Top Ships' press release also warned that the stock issued to Yorkville may trigger the provisions of the 2014 warrants. Ex. C at 65. Top Ships nonetheless continued to indicate to the investing public that it would continue to try to raise $200 million by issuing further shares. *See* AC ¶ 240.

**The Common Stock Kalani Agreed to Purchase**

More than two months after the class period began, Kalani agreed to provide financing to Top Ships in exchange for common stock.  Top Ships entered into a Common Stock Purchase Agreement ("CSPA") with Kalani, under which Kalani had to buy common stock at Top Ships' request, up to the total aggregate amount.  AC ¶¶ 12, 82-83.  It was Top Ships' decision when and if to issue stock to Kalani, and Top Ships disclosed that if it did so, this may result in dilution of existing stockholders and may cause the stock price to fall.  AC ¶ 167.

Top Ships' disclosure of the CSPA also included a press release and a prospectus supplement.  Ex. D; Ex. H.  These documents announced that, in exchange for its promise to purchase stock at Top Ships' request, Kalani received a discount and would receive certain shares of common stock for free as "commitment shares" upon execution of the CSPA, both typical terms of such financing transactions.  AC ¶¶ 83-84, 180.  Generally, Kalani would purchase shares for 93% of the recent market price.  However, if the market price had fallen below the "Floor Price" defined in the CSPA during any of the days in the "Pricing Period," Kalani could choose either to go ahead with the purchase at 93% of the Floor Price with respect to those days or to not purchase any shares with respect to those days.  AC ¶¶ 83, 85, 180; Ex. D at 10; Ex. H at 9-10, 52.  The CSPA also alerted the investing public that Kalani was free to sell its common stock at any time.  AC ¶¶ 7, 167; Ex. H at 34.  The prospectus supplement covered Kalani's resale of this stock and identified Kalani as an underwriter.  Ex. D at 1, 12, 27-28.

Between February and April 2017, Top Ships filed further prospectus supplements and amended the CSPA to increase the total amount of common stock that it might choose to sell to Kalani.  AC ¶¶ 84, 212; Ex. I; Ex. J; Ex. K; Ex. L.  In total, Kalani agreed to provide approximately $40 million in financing to Top Ships.  AC ¶ 143.  Top Ships publicly

disclosed each amendment as it occurred, each of which changed only the total aggregate limit of

the CSPA and the corresponding amount of commitment shares.  Ex. I at 4-5; Ex. J at 4; Ex. K at

4.  The fourth amendment to the CSPA also lowered the "Floor Price" from $0.50 to $0.216.  AC

¶¶ 85, 244; Ex. L at 4.  Top Ships updated the investing public on the total quantity of common

stock it had decided to issue Kalani by the date of each amendment.  AC ¶ 216.  The most

plausible inference for these amendments is that the parties were taking the financing step by

step, and expanded their agreement as each was satisfied with the arrangement so far.

Top Ships disclosed the risk of dilution from the CSPA in detail.  The prospectus

supplement added to the earlier warnings under a bold heading that stated, "Investors may

experience significant dilution as a result of this offering and future offerings."  Ex. D at 12.  Top

Ships alerted the investing public that if the stock price fell, Top Ships would have to issue more

stock in order to raise the same dollar value of financing.  *Id.*  Top Ships specifically noted that

"we may offer additional common stock in the future, which may result in additional significant

dilution," and that Top Ships' governing documents permitted it to "issue additional shares of

common or preferred stock or securities convertible or exchangeable into equity securities,

without shareholder approval."  *Id.*  Top Ships observed that its stock price had been and would

likely continue to be volatile.  *Id.* at 13.  Top Ships also explained that NASDAQ required a

minimum stock price of $1.00 in order for the stock to remain publicly listed.  *Id.*

**The Convertible Preferred Stock Xanthe Purchased**

On February 21, 2017, Xanthe agreed to pay $7.5 million to Top Ships in

exchange for convertible preferred shares, which Xanthe could later use to purchase discounted

common stock.  Specifically, Xanthe was credited the amount it had paid for the preferred

shares, and could request to exchange them for common stock at $3.75 per share or, at Xanthe's

7

option, the greater of $0.25 or 75% of the recent market price.  AC ¶¶ 87, 186; Ex. M at 34, 39.

Xanthe was also entitled to certain dividends, which it could receive as cash or additional

common stock.  AC ¶ 87; Ex. M at 5-6, 37.

Top Ships publicly disclosed the entire Securities Purchase Agreement ("SPA").

Ex. M.  Although the SPA did not name Xanthe, the terms of the SPA articulated all of Xanthe's

rights and obligations.  *Id.*  The SPA made clear that Xanthe could sell the common stock it

received at any time:  "the Investor does not agree, or make any representation or warranty, to

hold any of the Securities for any minimum or other specific term and reserves the right to

dispose of the Securities at any time."  AC ¶ 191.  Once again, Top Ships disclosed that the SPA

could cause significant dilution and may reduce the stock price.  AC ¶ 204; Ex. A at 29.

Throughout the proposed class period, Top Ships regularly updated the public

about its performance under its agreements with Xanthe and Kalani.  AC ¶ 217.  Top Ships chose

to sell Kalani the full amount under the CSPA by October 12, 2017; and by November 8, 2017,

Xanthe chose to convert the full amount under the SPA.  AC ¶ 92.

**The Promissory Notes Kalani and Xanthe Purchased**

In addition to these securities agreements, Kalani and Xanthe each purchased

promissory notes from Top Ships to provide the company with additional, non-dilutive funding.

These purchases provided Top Ships with cash, which Top Ships would pay back over time with

interest.

The notes were bona fide obligations of Top Ships, and Kalani and Xanthe bore

the substantial risk that Top Ships may not repay these loans, particularly if it went bankrupt or

prioritized other obligations more essential to keeping its business running.  Plaintiffs'

conclusory allegation that these were "sham transactions" overlooks the economic substance of

the notes and the risk Kalani and Xanthe took in making these loans.  AC ¶¶ 21, 103-105, 158, 230.  Plaintiffs attempt to support this conclusion by noting that the promissory notes and the share agreements involved a "circular" flow of cash.  *Id.*  They cannot claim to have been deceived by any of this, though, as the front page of each press release announcing a new note explicitly identified that Top Ships may use this cash to repay the notes.  *E.g.*, Ex. N at 2 ("The Company will use the proceeds from the previously announced public offering of its common shares, par value, $0.01 per share, pursuant to the Common Stock Purchase Agreement dated February 2, 2017 towards the repayment of a portion of the unsecured promissory note.").  Given that cash is fungible, how Top Ships chose to use its cash does not convert these binding transactions into something deceptive where, as here, every step in the process was publicly disclosed.

These notes provided Top Ships with immediate access to capital through financing that did not dilute shareholder equity.  With more working capital in hand, Top Ships had less need to draw down on the Kalani CSPA, under which Top Ships had sole discretion when and how much funding to request.  Without the notes, Top Ships may have had to draw down the CSPA more quickly, which could have accelerated the dilution of the stock price.

Xanthe's forgiveness of some of Top Ships' debt also provided a tangible benefit to shareholders and the company.  Plaintiffs argue that the "fact that Kalani [sic] was willing to forgo that sum … highlights the sham nature of these circular transactions."  AC ¶ 103.  Rather, this forgiveness of a small portion of the overall financing that Xanthe and Kalani provided to Top Ships demonstrates both parties' commitment to maintaining Top Ships as a going concern. *See* AC ¶¶ 102-103.

**Top Ships Obtained Similar Financing After Xanthe and Kalani**

   Top Ships entered into its largest financing arrangement during the proposed class period after it completed its deals with Xanthe and Kalani.  On November 7, 2017, Top Ships entered into a CSPA with Crede for $25 million.  AC ¶¶ 17, 96-97, 134, 221-222.  Then, on December 11, 2017, Crede and Top Ships entered into a second CSPA for a further $25 million. AC ¶¶ 17, 96-97, 134, 223.  Several of the terms of these CSPAs were less favorable to Top Ships than the Kalani CSPA, including $1 million in commitment fees, a discount at 91% of the recent market price, and no floor price at all.  AC ¶¶ 98-99.  The Crede CSPA was the largest during the entire proposed class period, and increased the total outstanding stock of the company from 17 million to 153 million shares.  AC ¶ 18.  Despite this fact, Plaintiffs name neither Crede nor Yorkville as a defendant in this action.  Furthermore, contrary to Plaintiffs' unsupported assertion that Top Ships turned away from Kalani because Top Ships received a subpoena from the SEC, Top Ships continued the very same financing with Kalani for almost three more months, then conducted two further similar financings with Crede.  *See* AC ¶¶ 16-17.  These circumstances indicate that Top Ships continued to believe this form of financing was appropriate, and Plaintiffs must agree as they assert no claims related to the Crede financing.

   The proposed class period ends a few weeks after Top Ships announced that it would not pursue any further convertible securities for a year starting March 23, 2018, including the 2014 warrants.  AC ¶ 139.  In all, Top Ships had issued only about $100 million of common stock, rather than half of the $200 million it initially predicted it would need.  *See* AC ¶ 143.

## <u>Argument</u>

   This action should be dismissed for several reasons.  First, Plaintiffs state no claim against Xanthe or Kalani because they identify no misconduct either of them committed. Second, Plaintiffs' bare bones allegations about Murchinson and Bistricer fail to satisfy the

exacting pleading standards applicable here.  Third, Plaintiffs' allegations are so sparse they cannot support personal jurisdiction over Murchinson and Bistricer, who are Canadian and, according to Plaintiffs, have no contacts with this forum.  Finally, Plaintiffs have failed to serve process on Kalani and Xanthe consistent with the Federal Rules and the Hague Convention.  The claims against all these Defendants must therefore be dismissed.

## I.    The Amended Complaint Fails to State a Claim Against Xanthe or Kalani

The claims against Xanthe and Kalani should be dismissed with prejudice for failure to state a claim upon which relief can be granted.  Murchinson and Bistricer also move to dismiss under Rule 12(b)(6), *infa* Part II, for the same and additional reasons.

An actionable complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*  Where Plaintiffs have "not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Every complaint alleging fraud must "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004).  Specifically, Plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012).

In addition, the PSLRA applies to private actions asserting claims—like each claim Plaintiffs assert—alleging violations of the federal securities laws.  Under the PSLRA, Plaintiffs must also specify (1) each allegedly misleading statement; (2) the reasons why each

statement was misleading; (3) the particular facts giving rise to a "strong inference" that the defendant acted with the required state of mind; and (4) all of the facts that formed Plaintiffs' belief in any allegation based on "information and belief."  15 U.S.C. § 78u–4(b)(1)-(2); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005); *Anschutz Corp.*, 690 F.3d at 108.  Plaintiffs do not meet this standard here.

### A. Plaintiffs' Section 10(b) Securities Fraud Claim Fails

Section 10(b) requires deception, which Plaintiffs do not plausibly allege as to Xanthe or Kalani.  Plaintiffs identify no misstatement or omission these Defendants "made" and thus state no claim under Rule 10b-5(b).  Nor do Plaintiffs allege any deception beyond misstatements or omissions that could satisfy 10b-5(a) or (c).  Plaintiffs also fail to plead the additional required elements of a Section 10(b) claim:  economic loss, loss causation, and reliance, as they have failed to identify what caused their losses, and in particular, that those losses stemmed from Plaintiffs' reliance on Kalani and Xanthe's words or conduct.

### 1. Plaintiffs state no claim under Rule 10b-5(b) because they allege no misstatement or omission Xanthe or Kalani "made"

Section 10(b) and Rule 10b-5(b) only reach the person who "made" a misstatement or omission:  the person who signed the disclosure or who had ultimate control over its content.  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-44 (2011).  According to Plaintiffs, Kalani and Xanthe did not make any of the relevant statements.  *See* AC ¶¶ 154-234.  And even if any of Top Ships' statements could properly be attributed to either Xanthe or Kalani, all of the cited statements were true and, as such, cannot be deceptive.

Plaintiffs note that the Xanthe SPA stated that Xanthe was acquiring stock "for its own account."  AC ¶¶ 9, 191.  This statement was true.  As the very same provision of the SPA

explained, Xanthe could sell its shares at any time, in compliance with the securities laws.  AC ¶ 191; Ex. M at 53.

Plaintiffs allege that Top Ships did not list Kalani as an underwriter in the registration statements it filed with the SEC, and failed to name Kalani as an underwriter in its prospectus supplements.  AC ¶ 161.  This allegation is simply false.  Every prospectus supplement identified Kalani as an underwriter on the front page and elsewhere throughout the document.  AC ¶ 170.  Further, these prospectus supplements were incorporated by reference into the registration statement.  AC ¶ 164.  Plaintiffs further allege that Kalani did not register as a dealer, but fail to explain why that could have mattered to any investor given the other extensive disclosures about how Kalani and Xanthe would conduct themselves under their respective agreements.  *See* AC ¶ 171.

Plaintiffs allege that the floor price was misleading because reverse splits would allow Xanthe or Kalani, respectively, to buy at an even lower unadjusted price.  AC ¶¶ 182, 193.  Plaintiffs cannot claim to have been misled because this was obvious from the terms of the agreements.  The Xanthe SPA, for example, stated unambiguously that "Floor Price means $0.25" and thus would apply without any adjustment for intervening stock splits.  Ex. M at 39.  The Kalani CSPA expressly stated that "at no time shall the Floor Price be lower than $0.50 per share unless the Company and the Investor [Kalani] shall mutually agree."  Ex. H at 52.

Plaintiffs assert that Top Ships should have disclosed that Xanthe and Kalani are affiliated, and that its failure to do so immediately gave the misleading impression that a new person "was investing in the Company for its own portfolio."  AC ¶¶ 8, 185.  This affiliation, though, was not hidden.  Just three weeks after the Xanthe SPA, Top Ships explained in its annual report that this "non-U.S. institutional investor"—Xanthe—was a company "affiliated

13

with Kalani."  AC ¶¶ 183-184.  Kalani and Xanthe also had the same attorney.  Ex. H at 46;

Ex. M at 88.  Most importantly, the publicly disclosed SPA did not indicate that Xanthe would

be a long-term investor; to the contrary, it disclosed that Xanthe could request shares anytime,

and sell them as it wished.  Moreover, Plaintiffs' own allegations indicate that Kalani was a

"secretive" BVI corporation and an "unknown entity," and Xanthe was "even more obscure and

unknown" than Kalani.  AC ¶¶ 2, 33, 73.  Plaintiffs cannot seriously contend that they relied on

these unknown, secretive, obscure entities in making their investment decisions.

Plaintiffs also allege that Top Ships did not disclose that part of its proceeds from

issuing shares would be used to repay the promissory notes.  AC ¶ 105.  To the contrary, Top

Ships disclosed just that on the front page of its press releases.  *E.g.*, Ex. N at 2.

Plaintiffs' allegations devolve to an obviously flawed circular argument:  that

Kalani and Xanthe engaged in a scheme to not say they were involved in a scheme.  AC ¶ 154.

The more plausible inference from the facts Plaintiffs allege is that they did not announce there

was a scheme because no scheme existed.  Without any deception, there was nothing left that

either Kalani or Xanthe had any duty to disclose.  *Glazer v. Formica Corp.*, 964 F.2d 149, 157

(2d Cir. 1992).

### 2. Plaintiffs state no claim under Rules 10b-5(a) or (c) because they allege no scheme beyond the purported misstatements or omissions

Rules 10b-5(a) and (c) focus on deceptive *conduct* and do not apply where, as

here, the gravamen of the claim is an alleged misstatement or omission.  *Lentell v. Merrill Lynch

& Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (rejecting scheme liability claims where "the sole basis

for such claims is alleged misrepresentations or omissions"); *SEC v. Kelly*, 817 F. Supp. 2d 340,

343-44 (S.D.N.Y. 2011) (rejecting scheme liability claims because the conduct was not "itself

deceptive," only separate misstatements); *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 358-

14

61 (D.N.J. 2009) (dismissing scheme liability claims for legitimate sales transactions where the only deception was the failure to disclose the deal's "real terms"); *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 377-78 (S.D.N.Y. 2006) (rejecting scheme liability claims that "designat[e] the alleged fraud a 'manipulative device' rather than a misstatement" where "the core misconduct alleged is in fact a misstatement").

The Amended Complaint makes clear that Plaintiffs' claims are really about omission and concealment, and thus are not cognizable under Rules 10b-5(a) or (c).  *See* AC ¶¶ 319-326.  Top Ships fully disclosed the agreements at issue and provided the investing public with regular updates about its performance.  Plaintiffs cite certain covenants in the agreements in which the parties agreed they would abide by the securities laws, but Plaintiffs provide no reason to believe any party violated any of those commitments.  *See* AC ¶¶ 175-179.  Plaintiffs thus fail to state any claim under Rules 10b-5(a) and (c).

### 3.  Plaintiffs cannot show economic loss or loss causation

Plaintiffs claim that they bought stock that was "virtually worthless" and allege the stock suffered from "artificial inflation."  AC ¶¶ 2, 21, 24, 29, 236-237.  Even if the Court accepts these conclusory and contradictory allegations as true, that does not establish the causation element of any of Plaintiffs' causes of action.  As in any damages inquiry, Plaintiffs must demonstrate what harm the alleged wrong proximately caused.  As the Supreme Court explained:

> an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.  For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. … one might say that the inflated purchase price suggests that the misrepresentation … "touches upon" a later economic loss. But, even if that is so, it is insufficient.  To "touch upon" a loss is not to *cause* a loss, and it is the latter that the law requires.

15

*Dura*, 544 U.S. at 342-43 (emphasis in original). "To hold otherwise would expose companies and their shareholders to potentially expansive liabilities for events later alleged to be frauds, the facts of which were known to the investing public at the time but did not affect share price, and thus did no damage at that time to investors." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 514 (2d Cir. 2010).

Plaintiffs here, much like the *Dura* plaintiffs, allege that they believe they bought at an inflated price. They do not tie that purportedly inflated price to any particular deception; all they can say is that the stock price gradually declined. *See Dura*, 544 U.S. at 347; AC ¶¶ 29, 236-237, 278. As the Supreme Court warned, "the longer the time between purchase and sale, … the more likely that other factors caused the loss," such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343. Plaintiffs aim to capture the entire decrease in the stock price over the 16-month class period as their economic loss simply because the decrease occurred. As this conclusory assertion does not link the loss to an alleged wrong, it does not satisfy the pleading standard. *Id.* at 345-47; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 103-04 (2d Cir. 2007).

### 4.    Plaintiffs cannot show reliance

Reliance is an "essential element" of each of Plaintiffs' causes of action. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). Plaintiffs fail to identify any statement or conduct by Xanthe or Kalani that they could have relied upon, and thus do not sufficiently plead this element.

Plaintiffs cite certain presumptions that can establish reliance in appropriate circumstances. AC ¶¶ 307-309. These presumptions cannot fill in the gaps in Plaintiffs'

pleading because Plaintiffs have not made the required showing with respect to each Defendant. *Stoneridge*, 552 U.S. at 159 (a plaintiff may rely on a defendant's omission if the defendant owed the plaintiff a duty to speak, and separately, a plaintiff may rely on a defendant's statement once it is made public); *Basic Inc. v. Levinson*, 485 U.S. 224, 248 (1988) ("Any showing that severs the link between the alleged misrepresentation and [plaintiff's] decision to trade at a fair market price" rebuts the presumption). Plaintiffs have not met this standard with respect to either of Xanthe or Kalani, because Xanthe and Kalani did not owe a duty to Plaintiffs under the law, and Xanthe and Kalani did not "make" these statements. Therefore, Plaintiffs have not established reliance on either of them. Plaintiffs' Section 10(b) claim must be dismissed.

> **B.      Plaintiffs' Market Manipulation Claims Also Fail**

Plaintiffs assert market manipulation under Section 9(a)(2) and Section 9(a)(4). AC ¶¶ 328-330. Plaintiffs' Section 9(a)(4) claim fails for the same reasons discussed above. Like Rule 10b-5(b), Section 9(a)(4) prohibits any person "to make … any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, and which that person knew or had reasonable ground to believe was so false or misleading … for the purpose of inducing the purchase or sale of such security." 15 U.S.C. § 78i(a)(4). Because Plaintiffs identify no misstatement or omission by either Kalani or Xanthe, Plaintiffs state no 9(a)(4) claim against these Defendants. *ECD Investor Grp. v. Credit Suisse Int'l*, 2017 WL 3841872, at *19, 22-23 (S.D.N.Y. Sept. 1, 2017) (lack of omission or misstatement fatal to 9(a)(4) claim); *Salvani v. ADVFN plc*, 50 F. Supp. 3d 459, 477 (S.D.N.Y. 2014) (failure to plead 10b-5(b) claim necessarily defeats 9(a)(4) claim).

Section 9(a)(2) prohibits effecting a series of securities transactions "raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). "The gravamen of manipulation is deception of

investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011).  Manipulation typically involves the creation of a false appearance in the market while avoiding actual economic risk, such as wash trades, in which trades that cancel each other out and thus have no ultimate change in beneficial ownership deceive investors into believing that trading is more active than it really is.  *SEC v. U.S. Envtl., Inc.*, 155 F.3d 107, 109 (2d Cir. 1998).  An actionable manipulation claim must "plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."  *ATSI Commc'ns*, 493 F.3d at 102.

Plaintiffs' Section 9(a)(2) claim fails against Kalani and Xanthe because Plaintiffs allege no manipulative conduct by either of them.  Plaintiffs allege merely that Kalani and Xanthe purchased common stock from Top Ships and later sold it, just as Top Ships fully disclosed to the investing public.  AC ¶¶ 87-88, 115, 158.  Plaintiffs allege Kalani and Xanthe sold their shares on the open market at the market price.  AC  ¶ 88, 118, 158.  This is not manipulation; it is ordinary market activity, consistent with normal market forces.

Plaintiffs' allegations that stock issuances were timed to "coincide" with price spikes conflict with Plaintiffs' own factual allegations.  For example, Plaintiffs note that Top Ships issued shares to Kalani by March 16, 2017, and that, after the issuance, the "stock price more than doubl[ed] … from $1.05 per share … to $2.20 per share."  AC ¶ 111.  Similarly, by March 27, 2017, a purported spike from $1.05 to $1.23 per share occurred, *after* Top Ships had issued shares to Kalani.  AC ¶ 112.  Thus, even in these instances, the purported "spike" occurred after Kalani's purchases; not the other way around.  These allegations reflect the volatility of the stock, and demonstrate that stock issuances were not motivated by any "spike."

18

Moreover, as Plaintiffs concede, reverse splits are not manipulative and Kalani and Xanthe had no role in deciding when to conduct them. Without deception, there was no manipulation. *Wilson*, 671 F.3d at 130; *ATSI Commc'ns*, 493 F.3d at 101 (short selling and converting shares not manipulative). Plaintiffs' Section 9 claims fail.

### C. Plaintiffs' Novel Insider Trading Claim Fails

Section 20A is not applicable to this case, which has nothing to do with insider trading. This provision permits contemporaneous traders to recover from those who trade on the basis of material nonpublic information in breach of a duty of trust or confidence. 15 U.S.C. § 78t-1. To state a Section 20A claim, Plaintiffs must establish that insider trading occurred, and that they traded contemporaneously with the insider trader. *Id.*

Nowhere in the Amended Complaint is there any indication that Kalani or Xanthe learned any information that was not already public by the time Kalani or Xanthe actually purchased or sold any common stock. The Amended Complaint identifies no mechanism that could have transmitted nonpublic information, and Plaintiffs fail to specify even a single piece of information Plaintiffs suspect either Kalani or Xanthe received early. Plaintiffs baldly state that "Defendants had direct access to information concerning Top Ships' business, operations, and finances" but Plaintiffs go on to describe how the *officers* of Top Ships had that knowledge without explaining how or what secret information Kalani or Xanthe possibly could have known. AC ¶¶ 267, 338-339.

Plaintiffs make the conclusory allegation that these Defendants "sold Top Ships common stock while in possession of material nonpublic information about the manipulative scheme alleged herein." AC ¶¶ 338-341. As described above, Plaintiffs have made no plausible allegation that there was a manipulative scheme. In addition, Kalani's or Xanthe's own knowledge of specific transactions they intended to pursue under the agreements was not

19

material nonpublic information.  To conclude otherwise would suggest that any person's plan to

buy or sell a stock is material nonpublic information, which is not the law.  *E.g.*, *Alexandra*

*Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, 2007 WL 2077153 (S.D.N.Y. July 20,

2007) (finding no duty to disclose plan to pay premium to early redeeming noteholder); *In re*

*Canandaigua Sec. Litig.*, 944 F. Supp. 1202 (S.D.N.Y. 1996) (no duty to disclose plan to sell

discounted products to gain market share).  Without any material non-public information,

Section 20A, by its plain language, cannot apply.  15 U.S.C. § 78t-1; *Lampf, Pleva, Lipkind,*

*Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 362 (1991); *Feiner Family Trust v. VBI Corp.*,

352 F. App'x 461, 464 (2d Cir. 2009); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326,

380 (S.D.N.Y. 2011); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 256 (S.D.N.Y.

2007); *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 389 (E.D.N.Y. 2003).

Plaintiffs must also allege the dates of the parties' trades to show they were

contemporaneous.  Plaintiffs' assertion that Kalani and Xanthe "sold," AC ¶ 341, is insufficient.

Plaintiffs note the dates of the agreements and Top Ships' public updates about how many shares

it issued to Kalani and Xanthe, but Plaintiffs do not allege when Kalani or Xanthe actually sold

stock to the public.  This failure to identify specific trades does not satisfy the pleading standard.

Fed. R. Civ. P. 9(b); *Gruber v. Gilbertson*, 2018 WL 1418188, at *18 (S.D.N.Y. Mar. 20, 2018);

*In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 & n.51 (S.D.N.Y. 2008) (only

trades within "a few days" of each other are contemporaneous).  As Plaintiffs have not identified

insider trading or contemporaneous trades, they have not adequately pled a Section 20A claim.

### D.  Plaintiffs Fall Short of the "Compelling" Showing of Scienter that Rule 9(b) and the PSLRA Require for Each of Plaintiffs' Claims

Plaintiffs' claims all require proof of scienter.  *Musick, Peeler & Garrett v.*

*Emp'rs Ins. of Wausau*, 508 U.S. 286, 296 (1993) (Sections 9, 10(b)); *SEC v. Obus*, 693 F.3d

276, 286 (2d Cir. 2012) (insider trading).  As a form of fraudulent intent, Plaintiffs must plead

scienter with particularity.  Fed. R. Civ. P. 9(b).  Under the PSLRA, a complaint must assert a

"strong inference" of scienter to survive a motion to dismiss.  15 U.S.C. § 78u–4(b)(2).  A strong

inference "must be more than merely plausible or reasonable—it must be cogent and at least as

compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 314 (2007).

There are two ways Plaintiffs can show scienter.  One way is for Plaintiffs to

establish that each Defendant "had the motive and opportunity to commit fraud" based on a

"concrete and personal" benefit and not just "goals that are possessed by virtually all corporate

insiders, such as the desire to . . . sustain the appearance of corporate profitability or the success

of an investment."  *Shemian v. Research in Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014);

*Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir.

2000).  Another way is for Plaintiffs to establish "strong circumstantial evidence of conscious

misbehavior or recklessness," which requires, "at the least, conduct which is highly unreasonable

and which represents an extreme departure from the standards of ordinary care to the extent that

the danger was either known to the defendant or so obvious that the defendant must have been

aware of it."  *Shemian*, 570 F. App'x at 35.

Here, at most, Plaintiffs allege that Kalani and Xanthe earned a profit from

providing financing to Top Ships, as all financiers do.  AC ¶¶ 10, 14.  Using a term of art

connoting manipulation, Plaintiffs say that Kalani "dumped" its shares on the market, causing

the stock price to decline.  AC ¶ 238.  To the contrary, Kalani acted according to the publicly

disclosed agreements and profited, if at all, by selling its stock hoping the volatile market price

would be above the discounted price it paid.  Plaintiffs' allegations of Kalani timing its trading

make no sense, particularly because the CSPA put Top Ships in charge of deciding when and how much stock to issue Kalani.  *See* AC ¶¶ 292-293.  As described above, there are no factual allegations that Top Ships coordinated its timing with Xanthe and Kalani.  *See* AC ¶ 111.

Plaintiffs' bare conclusion that "this toxic cycle could not have occurred without Defendants' knowledge of, and participation in, a deliberate fraudulent scheme" is completely unsupported and entitled to no weight.  AC ¶ 282.  The far more plausible inference is that Top Ships desired financing, was willing to issue common stock to obtain the financing, and publicly disclosed to all investors each and every step in doing so.  None of this conferred any unusual benefit on Kalani or Xanthe, and none of it shows any extreme risk they disregarded.  Contrary to Plaintiffs' claims, if anything, Xanthe's forgiveness of over $1 million of Top Ships' debt demonstrates that Xanthe cared about the financial health of the company.  *See* AC ¶ 294.  The $1 million was a small piece of the $100 million in financing Top Ships obtained during the proposed class period, and may well have avoided Top Ships having to issue further stock in order to raise comparable funds.  Plaintiffs' claims against Kalani and Xanthe cannot prevail because Plaintiffs present no "strong inference" of scienter.

## II.  Plaintiffs' Conclusory Pleading Regarding Murchinson and Bistricer Does Not Meet the Standard Required of Private Securities Class Action Plaintiffs

The Amended Complaint provides minimal factual detail about either Murchinson or Bistricer, to the point that it cannot state a claim against either of these Defendants, or indeed ground personal jurisdiction over them.  Accordingly, the claims against Murchinson and Bistricer should be dismissed with prejudice.

### A.   Plaintiffs' Minimal Allegations Against Murchinson and Bistricer Cannot Establish Primary Liability

#### 1.   Section 10(b) offers no private right of action for secondary liability

Plaintiffs seek to proceed against Murchinson and Bistricer because they were allegedly associated with or facilitated the transactions at issue.  But the Supreme Court held decades ago that no secondary liability exists under Section 10(b).  *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994).  The Supreme Court expressly held that in private actions like this, Section 10(b) reaches only "the making of a material misstatement (or omission) or the commission of a manipulative act," not those "who aid and abet" the violation.  *Id.* at 177, 184.  "[T]he conduct … must satisfy each of the elements or preconditions for liability."  *Stoneridge*, 552 U.S. at 158.  Whether a defendant is "a primary violator rather than an aider and abettor turns on the nature of his acts, not on his state of mind when he performed them."  *U.S. Envtl., Inc.*, 155 F.3d at 111.  Plaintiffs make no factual allegations about Murchinson's conduct or Bistricer's conduct, stating only that they somehow own and control Kalani and Xanthe.  Plaintiffs' attempt to hold Murchinson and Bistricer liable for the alleged conduct of others must be rejected.  *See, e.g.*, *Weinstein v. Cardis Enters. Int'l N.V.*, 284 F. Supp. 3d 240, 246-48 (E.D.N.Y. 2017) (dismissing Section 10(b) claims against executives who neither made statements nor engaged in specific acts themselves).

#### 2.   Plaintiffs' claims against Murchinson and Bistricer under Sections 9, 10(b), and 20A fail

The absence of allegations about Murchinson or Bistricer is fatal to Plaintiffs' claims against these Defendants under Sections 9, 10(b), and 20A.  Plaintiffs identify no statement Murchinson or Bistricer made, nor any duty on their part to speak.  *Janus*, 564 U.S. at 142-44.  Plaintiffs articulate no conduct of either Murchinson or Bistricer beyond what Top Ships disclosed to the public.  *Wilson*, 671 F.3d at 135-36.  As Plaintiffs specify no transactions

at all by either Murchinson or Bistricer, there is no basis to support any Section 9 or Section 20A claim against these Defendants. *ATSI Commc'ns*, 493 F.3d at 102; *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 426 (S.D.N.Y. 2010); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d at 309. Finally, absent allegations of any conduct by Murchinson or Bistricer, Plaintiffs cannot make a "strong showing" that these Defendants acted with scienter, or that Plaintiffs relied upon this conduct. The Amended Complaint does not state a claim against these Defendants.

### B. Neither Murchinson nor Bistricer Has Control Person Liability for Xanthe or Kalani's Actions

Plaintiffs also seek to pursue a cause of action under Section 20(a) for "control person liability." To state such a claim, Plaintiffs must demonstrate (1) a primary violation (2) by a person this Defendant controlled, and (3) culpable participation by this Defendant in the primary violation. *ATSI Commc'ns*, 493 F.3d at 108. While Plaintiffs need only make a plausible showing for the first two elements, they must plead culpable participation with particularity under the PSLRA. *E.g.*, *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 524 (S.D.N.Y. 2016). Regardless, however, because Plaintiffs have not alleged sufficient facts about Murchinson or Bistricer under any standard, Plaintiffs' control person liability claim fails.

As an initial matter, the Court does not need to reach this claim because Plaintiffs have not established any primary violation by Kalani or Xanthe. Without such a predicate violation, a Section 20(a) claim fails. *ATSI Commc'ns*, 493 F.3d at 108. Moreover, Plaintiffs have not provided any factual basis to support their bald legal conclusion that Murchinson and Bistricer "controlled" Kalani and Xanthe. AC ¶ 2. Plaintiffs allege that Murchinson and Bistricer exercised this control "by reason of their positions" but do not specify what those positions were or how these Defendants supposedly carried out this control. AC ¶ 335. These allegations are insufficient to establish either control or culpable participation by either of these

24

Defendants.  *E.g.*, *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 2005 WL 2148919, at *15 (S.D.N.Y. Sept. 6, 2005) (role as officer or director, or being the parent corporation of a primary violator subsidiary insufficient to demonstrate control); *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) (role as director alone insufficient).  The Amended Complaint fails to state a claim under Section 20(a) against Murchinson or Bistricer.

## III.     The Court Lacks Personal Jurisdiction over Murchinson and Bistricer

The lack of allegations against Murchinson or Bistricer in the Amended Complaint fails to establish personal jurisdiction over either Defendant in this forum.

The Exchange Act limits personal jurisdiction to defendants who have sufficient suit-related contacts with the United States as a whole, so long as the exercise of jurisdiction is reasonable under the circumstances of the case.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-69 (2d Cir. 1996); *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990).  A defendant has sufficient minimum contacts if, by its suit-related conduct, it "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  A defendant cannot be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts."  *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2801 (2011).  Nor can the plaintiffs' own contacts with the forum supply jurisdiction.  *Walden v. Fiore*, 571 U.S. 277, 284 (2014).  If sufficient suit-related contacts exist, the Court should consider several factors to ensure the exercise of jurisdiction is reasonable.  *Metro. Life*, 84 F.3d at 568 (listing factors).  It is Plaintiffs' burden to put forward a *prima facie* showing of personal jurisdiction over each defendant.  *Id.* at 566-67.  "A motion to dismiss must be granted if a court lacks personal jurisdiction."  *Pearson Educ., Inc. v. Kumar*, 721 F. Supp. 2d 166, 181 (D. Conn. 2010).

Bistricer and Murchinson are both based in Toronto, Canada, and are "at home" there.  AC ¶¶ 35-36; *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).  Plaintiffs have not alleged any suit-related contacts that could support specific personal jurisdiction because Plaintiffs have not alleged any conduct by Murchinson or Bistricer at all.  Plaintiffs' conclusory assertions that they "owned" or "controlled" Kalani or Xanthe, or may have profited from the agreements, are not sufficient to establish personal jurisdiction.  *Prime Movers Capital Partners LP v. Elixir Gaming Techs., Inc.*, 761 F. Supp. 2d 103, 106 (S.D.N.Y. 2011) (profit from obtaining control of a corporation in a transaction involving numerous stock options not a contact for purposes of personal jurisdiction); *Afloat in France, Inc. v. Bancroft Cruises Ltd.*, 2003 WL 22400213, at *9 (S.D.N.Y. Oct. 21, 2003) (partnership distributions from a New York based business to a British subject living in France not a contact).  Nor have Plaintiffs provided any basis to impute the contacts of Kalani or Xanthe onto these Defendants.  *Volkswagenwerk AG v. Beech Aircraft Corp.*, 751 F.2d 117, 120-22 (2d Cir. 1984).  The claims against Murchinson and Bistricer must be dismissed for lack of personal jurisdiction.

## IV.    Plaintiffs Have Not Properly Served Xanthe or Kalani

In addition to the failings above, Plaintiffs have not yet properly served Kalani or Xanthe.  A federal court cannot exercise jurisdiction over a defendant until the procedural requirement of service of process is satisfied.  *Dynegy Midstream Servs., LP v. Trammochem*, 451 F.3d 89, 94 (2d Cir. 2006).  The Constitution entitles each defendant to "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hannover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  Federal Rule of Civil Procedure 4(f) controls, and requires that Plaintiffs must use an internationally agreed means of service if one exists.  Fed. R. Civ. P. 4(f), (h)(2); *Freedom Watch v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74, 81 (D.C.

Cir. 2014); *West v. Terry Bicycles, Inc.*, 230 F.3d 1382 (Fed. Cir. 2000); *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 492 (3d Cir. 1993).  Relying on the internal law of the foreign place of service would ignore the plain language of the Rule.

There is at least one internationally agreed means available that would satisfy Rule 4(f)(1):  the Central Authority that the United Kingdom established in the BVI under the Hague Convention.  *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700-06. (1988); Ex. O ("Hague Convention") arts. 1-5; Ex. P at 2.  Plaintiffs did not seek the assistance of the BVI Central Authority here.  Dkt. 73-1, 73-4.

Plaintiffs' attempt at service is effective only if it was a method to which the United Kingdom agreed.  Fed. R. Civ. P. 4(f)(1).  In joining the Hague Convention, the United Kingdom issued several declarations regarding the optional provisions of the Hague Convention to which it would or would not agree.  Hague Convention arts. 7-10; Ex. O at 18; Ex. Q; *see Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508 (2017).  One such optional provision allows for personal service, "provided the State of destination does not object."  Hague Convention art. 10(b).  The United Kingdom objected, agreeing to personal service only when effected by a solicitor.  Ex. Q at 3 ("documents for service through official channels will be accepted in the United Kingdom only by the Central or additional authorities [identified under Article 18] and only from judicial, consular or diplomatic officers of other Contracting States"; "any person in another Contracting State who is interested in a judicial proceeding (including his lawyer)" may effect "service in the United Kingdom 'directly' through a competent person other than a judicial officer or official, e.g., a solicitor"); *see also* Ex. R at 11 (governing body of Hague Convention confirming the United Kingdom's preference for the use of direct service through English solicitors).  Plaintiffs assert reliance on article 10(b) but admit that the person who delivered the

27

documents was not a solicitor.  Dkt. 73 at 1-2, 73-1 at 2-3, 73-4 at 2-3.  This service attempt was therefore defective.

        While there is some split of authority on the issue, the better reasoned decisions on Rule 4(f) hold that only the methods to which a country "agreed" can be valid.  Because the language of article 10 simply states that it will not "interfere" with the "freedom" to serve process as described in its subsections, a country merely ratifying the Hague Convention does not thereby "agree" to allow those optional methods.  *E.g.*, *In re Coudert Bros. LLP*, 2017 WL 1944162, at *8 (S.D.N.Y. May 10, 2017); *Thomas & Thomas Rodmakers, Inc. v. Sharpe's, Inc.*, 2007 WL 1057382, at *5 (S.D. Ohio Apr. 5, 2007); *Tax Lease Underwriters, Inc. v. Blackwall Green, Ltd.*, 106 F.R.D. 595, 596 (E.D. Mo. 1985); *cf. Brockmeyer v. May*, 383 F.3d 798, 803-04 (9th Cir. 2004) (requiring country to expressly agree to article 10(a) international mail service). The United Kingdom knew how to agree to an optional provision when it wanted to.  *E.g.*, Ex. Q at 3 (the United Kingdom declared "no opposition" to article 10(a)).  It did not do so with respect to personal service, and the plain language of Rule 4(f) requires Plaintiffs to respect that sovereign choice.  The claims against Kalani and Xanthe must be dismissed for insufficient service of process.

<u>Conclusion</u>

        For the reasons set forth above, Xanthe, Kalani, Murchinson, and Bistricer respectfully request that the Court grant their motion to dismiss all of Plaintiffs' claims against them with prejudice.

Dated:  Washington, D.C.
       March 25, 2019

SCHULTE ROTH & ZABEL LLP

By: _____

Peter H. White (admitted *pro hac vice*)
Noah N. Gillespie
Jeremy Bachrach Siegfried

901 15th Street NW, Suite 800
Washington, D.C. 20005
(202) 729-7470

*Attorneys for Xanthe Holdings Ltd., Kalani
Investments Ltd., Murchinson Ltd., and Marc
Bistricer*