UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                                :

CHRISTOPHER BRADY, *Individually and On*    :
*Behalf of All Others Similarly Situated*,              :
                                                :

                  Plaintiff,               :
                                                  :         **MEMORANDUM DECISION**
                - against -             :         **AND ORDER**
                                                  :

TOP SHIPS INC.; EVANGELOS J. PISTIOLIS;    :    17-cv-4987 (BMC)
ALEXANDROS TSIRIKOS; KALANI                :
INVESTMENTS LIMITED; MURCHINSON        :
LTD.; MARC BISTRICER; and XANTHE          :
HOLDINGS LTD.,                           :
                                                :

                Defendants.           :
---------------------------------------------------------- X

**COGAN**, District Judge.

Lead plaintiffs bring this consolidated putative securities class action on behalf of all persons or entities who purchased or acquired Top Ships, Inc. common stock between November 23, 2016 and April 3, 2018.  Plaintiffs allege that defendants participated in a so-called "death spiral" financing scheme to manipulate the price of defendant Top Ship's common stock, which they facilitated by making a number of allegedly misleading statements and omissions.

By two separate motions, defendants Top Ships, Evangelos J. Pistiolis, and Alexandros Tsirikos and defendants Kalani Investments Ltd., Xanthe Holdings Ltd., Murchinson Ltd., and Marc Bistricer have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Defendants Murchinson and Bistricer have also moved to dismiss under Rule 12(b)(2) for lack of personal jurisdiction and defendants Xanthe and Kalani have moved to dismiss under Rule 12(b)(5) for insufficient service of process.  For the reasons below, defendants' motions to dismiss under Rule 12(b)(6) are granted.

## BACKGROUND[1]

Top Ships is a public holding company which owns – through its wholly-owned subsidiaries – tanker vessels that transport oil, petroleum, and bulk liquid chemicals. Top Ships is headquartered in Greece and its common stock trades on NASDAQ Capital Market. Pistiolis is Top Ship's President and Chief Executive Officer ("CEO"), and he also serves as a director. He founded Top Ships' predecessor company in 2000, which eventually became Top Ships in 2007. Tsirikos is Top Ships' Chief Financial Officer, as well as a director.

In 2008, Top Ships owned and operated approximately 19 tanker vessels. But by 2015, Top Ships was experiencing financial difficulties and sold off all but two vessels in its fleet. Beginning in 2017, Top Ships sought to rebuild its fleet through transactions with other entities that Pistiolis owned. Top Ships has paid Pistiolis-related entities a total of $36 million for the acquisition of new vessels.

In addition to vessel acquisition, Top Ships also began to operate through business contracts with Pistiolis-related entities. For example, in early 2016, Pistiolis created the Lax Trust, which is the sole shareholder of several entities that either Pistiolis or his family members own in full, which in turn, own significant stakes in Top Ships. Pistiolis controls the Lax Trust for the benefit of certain of his family members, which means that he controls each of the entities' stakes in Top Ships. On May 8, 2017, Top Ships issued 100,000 shares of Series D preferred stock to one of Pistiolis's entities in the Lax Trust for $1,000. This issuance gave Pistiolis voting power equivalent to 100 million common shares, which allowed him to control the outcome of subsequent shareholder votes.

---

[1] These facts taken from plaintiffs' complaint are presumed true and construed in the light most favorable to plaintiffs for the purpose of defendants' motion to dismiss under Rule 12(b)(6) only.

Top Ships is also a member of a private company called the Central Group, as well as three other entities that Pistiolis owns or controls.  There is senior management and board overlap among Top Ships and Central Group, including that Pistiolis and Tsirikos serve as directors of both companies.

Since 2010 and continuing into 2018, Top Ships paid the Pistiolis-related Central Group entities millions of dollars in administrative costs, including for executive officers (which covered Pistiolis's and Tsirikos's salaries and Pistiolis's incentive payments and bonuses), vessel management and supervision, financing fees, commissions on vessel sales, accounting and administrative services, and newbuilding supervision costs.

Top Ships has also entered into a $15 million unsecured revolving credit facility with a Lax Trust entity named Family Trading, the purpose of which was to fund Top Ships' new building program.  Top Ships continuously pays fees on this loan, and as Top Ships drew down on the loan, Family Lending became entitled to receive shares of Top Ships common stock at a 20% discount to the market price, with a floor price of $0.60 per share.  On February 21, 2017, Top Ships and Family Trading amended the terms of the $15 million loan to remove any limitation on the use of the funds under the credit facility, reduce the mandatory cash payment due when Top Ships raises capital through the issuance of securities, and extend the loan by three years with an increased interest rate.

The class period begins on November 23, 2016, when Top Ships filed a registration statement with the Securities and Exchange Commission ("SEC"), seeking permission to issue $206.65 million in common and preferred stock.  At that time, Top Ships had approximately 5.7

million shares of common stock outstanding, and a market capitalization of approximately $19.6 million.[2]

On January 17, 2017, Top Ships withdrew the registration statement, but replaced it with a similar version that had been amended several times. The final registration statement authorized Top Ships to issue securities up to an aggregate offering price of $202.47 million. The SEC determined that this revised registration statement was effective on February 1, 2017.

Top Ships filed a prospectus supplement and a Form 6-K (which referenced the prospectus supplement) on February 2, 2017, the day after the registration statement became effective. These filings announced that Top Ships had entered into a Common Stock Purchase Agreement ("CSPA") with Kalani, pursuant to which Kalani agreed to purchase Top Ships' common stock at a discounted price per share of 93% of the lowest volume-weighted average price during a certain identified period. This was subject to a floor price that could be no lower than $0.50, unless the parties agreed otherwise.

The Form 6-K attached a copy of the February 2, 2017 CSPA. The CSPA made several warranties, including that no party had taken any action designed to manipulate the price of Top Ships' securities and that Top Ships would comply with all applicable securities laws and rules, such as those prohibiting the disclosure of material non-public information. The CSPA also disclosed that there were no outstanding debt securities or other contracts by which Top Ships might become bound to issue additional shares of company stock.

---

[2] The registration statement also disclosed that Top Ships sold 3,160 Class B convertible preferred shares to YA II CD, Ltd., which is managed by Yorkville Advisors Global, LLC, for $3 million. These preferred shares allowed Yorkville to purchase Top Ships common stock at a discounted price. On January 9, 2017, Top Ships and Yorkville agreed to cancel Yorkville's purchase of the $1 million worth of shares that remained under the agreement.

The prospectus supplement announced that Top Ships would "use the net proceeds from the sale of the common stock offered by this prospectus supplement for general corporate purposes." The prospectus supplement also stated that:

> We may sell large quantities of our common stock at any time pursuant to this prospectus supplement or one or more separate offerings. If we elect to draw down amounts under the Purchase Agreement, which will result in the sale of additional shares of our common stock to the Investor, any such drawdowns will have a dilutive impact on our existing stockholdings. The Investor may resell some or all of the shares of our common stock we issue to it pursuant to draw downs under the Purchase Agreement and such sales could cause the market price, and the VWAP, of our common stock to decline.

Finally, the prospectus supplement stated that "[w]e know of no existing arrangements between [Kalani] and any other stockholder, broker, dealer, underwriter, or agent relating to the sale or distribution of the shares of our common stock offered by this prospectus supplement."

Top Ships and Kalani amended this CSPA four times: on March 17, March 27, April 4, and April 27, 2017. The parties agreed in the final CSPA to the sale of over $40 million worth of Top Ships common stock, $605,991 worth of shares in commitment fees, and a floor price of $0.216 per share.

On February 21, 2017, Top Ships filed a Form 6-K and Statement of Designations announcing that it entered into a $7.5 million securities purchase agreement ("SPA") with a "non-U.S. institutional investor" for the sale of 7,500 newly-issued Series C convertible preferred shares, which were convertible into common stock at a fixed conversion price of $3.75 per share. Each preferred share allowed the purchaser to purchase common stock in the amount of $1,000 plus interest and fees at a price equal to the higher of 75% of the lowest volume weighted average price for any trading day during the 21 days prior to the date of conversion or the floor price of $0.25. Top Ships disclosed in its 2016 Annual Report on March 14, 2017 that

5

the transaction was with a company affiliated with Kalani.  Although Top Ships never disclosed the purchaser's identity, it was Xanthe.

In that same Annual Report, Top Ships said that the CSPA and SPA "may require us to issue a large number of common shares upon conversion, which may significantly depress the trading price of our common shares and significantly dilute existing shareholders."  It also said that "[s]hareholders may experience significant dilution as a result of future equity offerings or issuance if shares are sold at prices significantly below the price at which shareholders invested" and that "[f]uture issuances or sales, or the potential for future issuances or sales, of our common shares, may cause the trading price of our securities to decline and could impair our ability to raise capital through subsequent equity offerings."  The 2016 Annual Report also provided that "[t]he interests of the Lax Trust or the family of Mr. Pistiolis . . . [which] has the power to exert considerable influence over our actions and to effectively control the outcome of matters on which our shareholders are entitled to vote . . . [,] may be different from your interests."[3]

After entering into the CSPA and the SPA, Kalani and Xanthe began purchasing millions of dollars' worth of Top Ships stock at a discounted price and re-sold those shares at market price in the secondary market.  Over time, this practice of issuing, purchasing, and re-selling Top Ships securities caused the number of outstanding shares of Top Ships common stock to skyrocket and caused the price of Top Ships common shares to decline.

On March 6, 2017, Top Ships announced that it was holding a special meeting of its shareholders on March 24, 2017 to vote on a proposal to allow Top Ships' Board of Directors

---

[3] The 2016 Annual Report also stated that Top Ships had a working capital deficit of $15.5 million, but that it expected to have more cash flow in 2017 and that it would finance its working capital deficit with that cash flow, as well as drawdowns from the Amended Family Trading Credit Facility, dividends from its interest in a vessel, sales of its stock and from other equity or debt offerings.  It also disclosed that Top Ships' Board of Directors had adopted a Corporate Code of Business Ethics and Conduct, which complied with SEC guidelines.

(the "Board") to effect at its sole discretion a reverse stock split at a ratio of between 1-for-2 and 1-for- 20 any time before the annual shareholder meeting scheduled for June 9, 2017.  The shareholder notice said about the proposal that "The Board intends to effect the proposed stock split only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders."  The shareholders approved the proposal at the meeting.

The Board effected a 1-for-20 reverse stock split on May 11, 2017, which reduced the total number of outstanding shares from 45 million to 2.2 million.  Top Ships' stock price rose from $0.175 to $1.83 per share.  This price increase allowed Kalani to continue purchasing shares of Top Ships' common stock above the floor price pursuant to the CSPA.

At the June 9, 2017 annual shareholder meeting, shareholders passed another proposal to allow the Board to effect reverse stock splits at a ratio of between 1-for-2 and 1-for-1000 shares. The May 19, 2017 shareholder notice of this proposal and vote contained the same "best interest" language as the previous proposal regarding reverse stock splits.

The Board effected a 1-for-15 reverse stock split on June 22, 2017, which reduced outstanding shares from 21.6 million to 1.4 million and increased Top Ships' stock from $0.16 to $0.80.  The Board effected another 1-for-30 reverse stock split on August 3, 2017, which reduced the amount of shares outstanding from 18.7 million to 0.6 million and increased the stock price from $0.242 to $2.30.  Then on October 6, 2017, the Board effected another 1-for-2 reverse stock split, which decreased the amount of outstanding shares from 15.6 million to 7.8 million and increased the share price from $0.2733 to $0.5325.

Top Ships completed the CSPA with Kalani on October 12, 2017 by selling the total

dollar amount of common shares provided for in the agreement, and by November 7, 2017,

Xanthe had exercised all of its Series C convertible preferred shares.  Top Ships issued

approximately 113.9 billion common shares to Kalani under the CSPA and issued approximately

162.8 billion common shares to Xanthe (and, by extension, Kalani) under the SPA.[4]

On November 7, 2017 and December 11, 2017, Top Ships entered into two $25 million

CSPAs with a different purchaser named Crede CG.[5]  These CSPAs provided for the purchase of

Top Ships common stock at the discounted rate of 91% of the lowest daily volume weighted

average price in nine days preceding the purchase date and $1 million in commitment fees.

These CPSAs did not contain a floor price.  The number of shares that Crede could be required

to purchase depended on the price of the stock during the first 30 minutes of trading on the

transaction date.

The Crede CSPAs also provide that "[b]y its ownership of 100% of our Series D

Preferred Stock, Lax Trust has control over our actions.  The interests of [the] Lax Trust may be

different from your interests."

The prospectus supplements filed alongside the Forms 6-K announcing the CSPAs with

Crede provided that Top Ships would use the proceeds of the Crede CSPAs for general corporate

purposes.  They also provided that Top Ships "may sell" shares under the CSPA and that Crede

"may resell some or all of the shares of [top Ships] common stock" issued to it.  Further, they

---

[4] These numbers are not adjusted for the reverse stock splits.

[5] Before Top Ships entered into the Crede CSPAs, the SEC subpoenaed Top Ships on August 1, 2017 (which the company disclosed in its 2017 Annual Report on March 29, 2018), related to offerings that Top Ships made between February and August 2017.  Plaintiffs make much about this fact, which they argue suggests the existence of a manipulative scheme, because once the SEC caught wind of what it was doing with Kalani, Top Ships needed to find a new purchaser to continue its scheme.  Assuming that is even a plausible inference to draw, this fact is not relevant to the dispositive arguments that defendants make in their motions to dismiss, as demonstrated below.

represented that "[w]e know of no existing arrangements between [Crede] and any other stockholder, broker, dealer, underwriter, or agent relating to the sale or distribution of the shares of our common stock offered by this prospectus supplement."

Top Ships also issued unsecured promissory notes to Kalani, Xanthe, and Crede over the course of 2017 and 2018. Top Ships drew down $39 million from its notes with Kalani and $30 million from its notes with Crede. Xanthe wrote off $1.1 million that Top Ships owed it without explanation. Top Ships repaid the amounts due under these notes through its proceeds from the CSPA and SPA transactions.

On November 3, 2017, the Board held another special meeting of the shareholders, during which the shareholders passed a proposal to allow the Board to effect more reverse stock splits at a ratio between 1-for-2 and 1-for-10,000. On March 22, 2018, the Board effected a 1-for-10 reverse stock split.

Also on March 22, 2018 – the end of the class period – Top Ships announced that it would stop making the types of share issuances it had made under the CSPAs and SPAs for one year. During the class period, Top Ships increased its common shares from 5.7 million to over three trillion, and its stock price fell from $3.39 per share to $0.00000973 per share,[6] which means that every $350,000 that was invested in Top Ships as of November 23, 2016 was worth $1 as of March 22, 2018.

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that

---

[6] This price is not adjusted to reflect the reverse stock splits.

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citations omitted).  Said otherwise, plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In conducting the above analysis, the Court must accept as true all of the well-pled allegations contained in the complaint.  Iqbal, 556 U.S. at 678.  But this tenet "is inapplicable to legal conclusions." Id.  "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555).

Where, as here, the complaint alleges securities fraud, the allegations are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

A complaint alleging securities fraud must also comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  The PSLRA provides that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  The PSLRA also provides that

"the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Thus, § 10(b) "in proscribing the use of a manipulative or deceptive device or contrivance, prohibits not only material misstatements but also manipulative acts."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (internal quotation marks and citations omitted).

Rule 10b-5, promulgated by the SEC, provides that it "shall be unlawful for any person . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  17 CFR § 240.10b-5.

## I.    Market Manipulation

Plaintiffs claim that defendants violated § 10(b) and Rule 10b-5(a) and (c) by engaging in a scheme to manipulate the price of Top Ships common stock.

"Market manipulation requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the

11

mails or any facility of a national securities exchange." ATSI, 493 F.3d at 101 (citing Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999); Cowen & Co. v. Merriam, 745 F. Supp. 925, 929 (S.D.N.Y. 1990)).

Defendants' motions to dismiss under Rule 12(b)(6) focus on the first element – the existence (or non-existence) of manipulative acts.  "[M]anipulation 'connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'"  Id. at 100 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976)).  "The critical question" is whether the alleged manipulative act "'artificially' affects a security's price in a deceptive manner."  Id.

"The deception arises from the fact that investors are misled to believe that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  ATSI, 493 F.3d at 100 (internal quotation marks and citations omitted).  "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market."  Id.

"A market manipulation claim, however, cannot be based solely upon misrepresentations or omissions."  Id. at 101 (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005)).  "There must be some market activity, such as wash sales, matched orders, or rigged prices."  Id. (citing Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 476 (1977)).  In other words, "[t]o be actionable as a manipulative act, [an act that is not inherently manipulative] must be willfully combined with something more to create a false impression of how market participants value a security."  Id.

12

As a result, market manipulation claims often involve facts "solely within the defendant's knowledge." Id. at 102 (citations omitted).  Because those facts are often difficult to know before discovery, "the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." Id. (citation omitted).  Rather, "a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." Id. (citations omitted).  It must set forth "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id. (citations omitted). "General allegations not tied to the defendants or resting upon speculation are insufficient." Id. (citations omitted).

Plaintiffs allege that defendants engaged in the following general pattern of manipulative acts during the class period:  Kalani and Xanthe promised to pay Top Ships a significant amount of money in exchange for a significant amount of Top Ships securities; Top Ships promised to "repeatedly induce artificial increases to the price of Top Ships' common stock" by effecting the reverse stock splits, which would allow Kalani and Xanthe to sell at a profit their common stock; and Kalani and Xanthe responded to the reverse stock splits by selling their securities, "thereby injecting capital into Top Ships and depressing the price of Top Ships' common stock."  This alleged manipulative scheme, drawn out over several installments, resulted in the "intentional decimation" of the value of Top Ships' securities.

Plaintiffs also allege that defendants were able to conceal this scheme for so long by using the proceeds from the promissory notes that Top Ships issued to Kalani, Xanthe, and Crede to pay Pistiolis-related entities and by using the proceeds from the share issuances to Kalani, Xanthe, and Crede to repay Top Ships' obligations under the promissory notes.

Defendants' main argument – and it is a good one – is that this conduct was not manipulative because it was fully disclosed to the market, including Top Ships' shareholders. Plaintiffs acknowledge that "the market is not misled when a transaction's terms are fully disclosed."  Wilson v. Merrill Lynch & Co., 671 F.3d 120, 130 (2d Cir. 2011).  But plaintiffs argue that the transactions were not fully disclosed in this case.

All plaintiffs say in support of that argument, however, is that the transactions were manipulative because defendants did not disclose to the market their "true purpose" – "namely, that they formed part of Defendants' manipulative scheme."  But this is a classic example of circular reasoning and conclusory pleading.  Plaintiffs have only alleged that defendants' conduct was manipulative because they did not tell shareholders that their conduct was manipulative.

Plaintiffs also argue that the conduct was manipulative because defendants did not "disclose the full import and cumulative effect that those actions would actually have upon Top Ships' share price in the context of their manipulative scheme."  But plaintiffs have pleaded no facts, except for the transactions themselves, that give rise to any inference – let alone the heightened inference necessary to plead any form of securities fraud – that defendants had any such knowledge about the collective impact of each manipulative act alleged.  Even though the complaint must be construed in its entirety, a collection of several transactions, coupled with a conclusion that those transactions are manipulative based solely on their volume, is not enough to state a claim for market manipulation.

Plaintiffs have put the cart before the horse.  They have concluded that fraud occurred and employ that conclusion to argue that they have stated a claim for fraud.  But plaintiffs cannot escape the fact that "[i]n order for market activity to be manipulative, that conduct must involve

14

misrepresentation or nondisclosure." Id. Every term in each transaction that they challenge in the complaint was disclosed to them. As plaintiffs acknowledge, Top Ships attached the purchase agreements to the SEC filings announcing the transactions, and plaintiffs voted to approve the reverse stock splits.

Plaintiffs rely heavily on Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 81-83 (S.D.N.Y. 2015). Their reliance is not entirely misplaced. The Sharette court found that the plaintiffs stated a claim for market manipulation by alleging, in addition to a high volume of short sales, that the defendants orchestrated a "manipulative scheme," "for the purpose of allowing their hedge fund clients to make huge profits while sinking the price of [the company's] stock," "hid this purpose from [the company's] investors," and "intentionally lent out far more shares of common stock" than necessary to allow for the alleged short sales that allowed the defendants to manipulate the price of the company's stock. Those allegations mirror the complaint at issue here.

But there is a critical difference between this case and Sharette: plaintiffs do not challenge a high volume of short selling over which they could have no control and of which they have no specific knowledge. Rather, they challenge (1) transactions where the entire purchase agreements were disclosed to them; and (2) reverse stock splits that they approved by shareholder vote.

Plaintiffs argue that defendants knew all along that these transactions could not sustain the artificial value of Top Ships stock that they created, but plaintiffs have included no facts other than the transactions themselves and the eventual effect that they had on the price of Top Ships securities to suggest that defendants had any such knowledge. Plaintiffs also argue that the purchase agreements were not disclosed to them in their entirety because shareholders did not

15

know – but defendants did know – that Kalani, Xanthe, and Crede would purchase and immediately resell the securities and that conduct would have the effect of diluting the market for Top Shares common stock. But this inference is belied by the facts that are included in the complaint.

For example, the prospectus supplement that Top Ships issued with the Kalani CSPA informed plaintiffs that Top Ships would use the proceeds for general corporate purposes, that Top Ships might sell large quantities of its stock pursuant to the agreement, that those sales will have a dilutive impact on the current shareholders, that the purchaser may resell up to all of those shares, and that those resales could cause the market price of Top Ships common stock to decline. That is precisely the alleged manipulative scheme that plaintiffs challenge here. They were told about it upfront, so there can be no manipulation related to these purchase agreements.

Plaintiffs also argue that, despite the fact that they voted to approve the reverse stock splits that they now challenge as manipulative, those reverse stock splits were manipulative because defendants never told them that Top Ships intended to use them as a means to temporarily inflate the price of Top Ships stock to allow Kalani and Xanthe to trade their securities at a profit. But that, of course, is merely what plaintiffs assume happened.

Plaintiffs agree that reverse stock splits are not in and of themselves manipulative; instead, they challenge as manipulative the purpose that the reverse stock splits served in the alleged overarching scheme. Namely, as mentioned above, plaintiffs argue that they were led to believe that the reverse stock splits were intended to maintain the increased price of Top Ships securities, rather than to allow Kalani and Xanthe to sell their shares at a profit. But the other issue with this allegation is, if plaintiffs did not agree with the conduct that they approved through the vote, they too could have sold their shares at a profit – just like Kalani and Xanthe.

As holders of Top Ships common stock, these shareholders were all equally informed and similarly situated to Kalani and Xanthe in this instance.  There is nothing about this alleged scheme that shows or suggests how defendants sent a "false pricing signal" to the market.  See ATSI, 493 F.3d at 100.

Moreover, to the extent Sharette suggests a different conclusion, I do not find it persuasive.  Although the Sharette court found solace in ATSI's language that Rule 9(b)'s heightened pleading standard is relaxed for market manipulation claims to bypass the acknowledged lack of "extensive factual detail" in the complaint, Sharette, 127 F. Supp. 3d at 83, ATSI does not allow a market manipulation claimant (or, for that matter, any other type of claimant) to substitute legal conclusions for well-pled facts.

Nor does Dodona I, LLC v. Goldman, Sachs & Co., 847 F. Supp. 2d 624 (S.D.N.Y. 2012), change the outcome.  Although the Dodona court found that the plaintiffs had adequately pled market manipulation by alleging that "the act of structuring, offering, and selling [transactions at issue] was itself a manipulative market activity," those transactions are a far cry from the transactions at issue in this case.  Dodona involved Goldman Sach's creation of synthetic collateralized debt obligations to cover its huge financial exposure from its holdings in subprime mortgage-backed investments.  Goldman Sachs structured these investments in a way that virtually guaranteed it would receive insurance on its risky positions.  Because the plaintiffs had alleged enough detail about the purpose and structure of those investments, the complaint allowed the court to infer that Goldman Sachs believed these investments would not be profitable for investors and knew that the investments were simply a part of its risk-reduction strategy.

Moreover, the investment instruments in Dodona were so confusing that "few but a select group of [Goldman Sach's] own designers, engineers and lawyers could clearly explain, let alone

understand, precisely how it functions or exactly what it does." Id. at 640. The Dodona court focused on how even the most sophisticated investors would have had trouble understanding the terms of the debt obligations at issue.

Here, plaintiffs do not allege that they were duped by sophisticated nature of the transactions or even because defendants had some self-serving reason other than paying salaries or fulfilling contract obligations to enrich themselves. Plaintiffs were not in the dark about Top Ships' corporate relationships with Pistiolis-related entities, and the 2016 Annual Report – which was issued before any vote was held on the reverse stock splits – clearly stated that Pistiolis was able to control the company's decisions and that his interests may be adverse to the rest of the shareholders. Plaintiffs simply allege that they were duped because they were not told there was an ongoing scheme to dupe them. Plaintiffs might not have been aware of the potential effect of these transactions on the value of their Top Ships stock, but that lack of awareness cannot be attributed to defendants.

Because plaintiffs rely only on mere legal conclusions and speculation, and because the facts in the complaint suggest that they were fully aware of the alleged manipulative scheme they challenge here, plaintiffs have failed to state a claim for market manipulation.[7]

## II.     Misstatements and Omissions

Plaintiffs also claim that defendants made misrepresentations or omissions in violation of § 10(b) and Rule 10b-5(b), thus alleging another avenue of securities fraud.

---

[7] Because plaintiffs must also plead a series of manipulative acts for a successful market manipulation claim under § 9(a)(2), they have also failed to state a market manipulation claim under that section of the Securities Act. See Cohen v. Stevanovich, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) (citing 15 U.S.C. § 78i(a)(2)) ("Section 9(a)(2) requires plaintiffs to identify transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security with the intent to deceive or defraud investors.").

### A.  The November 23, 2106 and January 17, 2017 Registration Statements

Plaintiffs allege that November 23, 2016 and January 17, 2017 registration statements

were false or misleading because they did not disclose that:

1.  "the true purpose of these offering materials, subsequent transaction documents, and/or anticipated securities sales and issuances was to provide Top Ships with financing that benefitted Defendant Pistiolis and his related companies and to otherwise funnel money to the Top Ships and Kalani Defendants, all at the expense of Top Ships' common shareholders";

2.  "at the time of these statements, the Top Ships and Kalani Defendants already knew and intended that Kalani would be sold common stock and issued convertible securities at below-market prices to the fullest extent allowed under their agreements (including agreements that were not yet disclosed) that they would then resell to investors";

3.  "the Top Ships and Kalani Defendants were already engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by the dumping of newly-issue common shares would be utilized to manipulate the price of Top Ships common stock";

4.  "the Top Ships and Kalani Defendants already knew that Top Ships would engage in manipulative reverse stock splits that would artificially prop up the Company's share price by reducing the number of outstanding shares of Top Ships common stock, thereby allowing the Kalani Defendants to profit by selling Top Ships common stock to investors at inflated prices and allowing the financing scheme to continue";

5.  "their scheme was certain to effectively dilute the interest of existing shareholders ad destroy essentially all shareholder value for the benefit of Defendants";

6.  "although Top Ships is a public company, it operated as merely a cog in Pistiolis's larger group of private companies and served to funnel money from Top Ships shareholders to Pistiolis and related parties"; and

7.  "funds raised through the sale of securities to Kalani would be the only source of funds used to repay promissory notes that Top Ships would issue in sham transactions that bore no risk, further concealed Defendants' financing scheme,

and paid Kalani even more profits for facilitating the transfer of funds from investors to Pistiolis and related entities."

As explained above, these allegations simply do not play out in the facts. There is nothing to suggest that any of these purported omissions are something that defendants knew or should have known at the time the registration statements were filed. Plaintiffs' allegations suffer from the same deficiencies identified above – they simply conclude that something nefarious occurred. They do not give rise to a plausible inference of fraud.

As an initial matter, as alleged, the registration statements merely disclosed the terms of the agreements to issue stocks and that defendants "may" act accordingly under those agreements. Plaintiffs repeatedly challenge defendants' use of the word "may" as misleading in this case, but as the Second Circuit has already explained, "an investor could more easily understand the word as disclosing merely that [defendants were] permitted, but not required" to act in accordance with the disclosure. Wilson, 671 F.3d at 133. Plaintiffs argue that notwithstanding the general acceptance of this standard interpretation, where, as here, defendants knew with certainty that they would act accordingly with the permissive disclosure, then defendants' use of "may" is inappropriate under the securities laws. But the complaint includes no facts to suggest that defendants knew with any amount of certainty that this was the case. The disclosures simply put plaintiffs on notice that defendants might do what they ended up doing. That is not securities fraud.[8]

---

[8] Plaintiffs separately challenge as misleading the Form 6-Ks that Top Ships filed periodically announcing the number of shares that Top Ships had sold pursuant to the CPSAs. Specifically, plaintiffs challenge defendants' statements that Top Ships "may" continue to issue to Kalani shares under the agreement when plaintiffs allege that defendants knew they would fully exhaust the agreements. For the same reasons, this claim does not amount to securities fraud.

As relevant to plaintiffs' allegations, defendants fully disclosed the facts about the transactions and their potential consequences.  Although plaintiffs allege that at the time they entered into the agreements, Top Ships and Kalani knew they would engage in the subsequent conduct at issue in this case, plaintiffs plead nothing other than the fact that they did engage in the subsequent conduct to support that allegation.  Without more, this inference is not plausible under the heightened pleading standards of Rule 9(b) and the PSLRA.

Plaintiffs also allege that the registration statements were false or misleading because defendants did not disclose their fraudulent scheme as a known trend reasonably likely to result in a material change in the company's liquidity pursuant to Item 303 of SEC Regulation S–K; did not disclose their fraudulent scheme as a risk factor pursuant to Item 503 of SEC Regulation S–K; did not disclose that Kalani was an underwriter of the issued securities pursuant to Item 508 of SEC Regulation S–K; did not disclose that Kalani was a securities dealer pursuant to Item 508 of SEC Regulation S–K; or the nature of Kalani's transactions as an underwriter and securities dealer pursuant to Item 508 of Regulation S–K.

But, as defendants note, Top Ships is a foreign private issuer, which means that it is not subject to SEC Regulation S–K, and it had no obligation to make the disclosures that plaintiffs allege it failed to make.  See In re Top Tankers, Inc. Sec. Litig., 528 F. Supp. 2d 408, 416 (S.D.N.Y. 2007).  "Because omissions are not actionable absent a legal duty to disclose," any failure by defendants to comply with SEC Regulation S–K "is insufficient to allege securities fraud."  Pearlstein v. BlackBerry Ltd., 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015).[9]

---

[9] Even if Regulation S–K did apply to Top Ships, there is no plausible inference of a scheme to manipulate the Top Ships market so that purported scheme cannot fairly be described as a "risk factor" or anything similar to include in these required disclosures.  Moreover, the registration statements included the prospectus supplement for this purpose, see In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 657 (S.D.N.Y. 2004) (quoting 12 C.F.R. § 16.2(m)), which in this case disclosed that Kalani was an underwriter.

Thus, plaintiffs have not shown that there was a misstatement or omission in the registration statements, so they have not stated a claim for securities fraud based on those disclosures.

### B.  The February 2, 2017 Prospectus Supplement

Plaintiffs allege that defendants' February 2, 2017 prospectus supplement was false or misleading for the same seven reasons listed above with respect to omissions in the registration statements.  Those reasons are equally unpersuasive here.

Plaintiffs further challenge defendants' alleged misstatement in the prospectus supplement that Top Ships intended to use the proceeds of the CSPA with Kalani "for general corporate purposes."  Plaintiffs argue that this was misleading because defendants intended to and actually used the proceeds "for the benefit of Defendant Pistiolis and his related companies, family members, and other Top Ships insiders."  But the complaint (understandably) does not claim that paying executive salaries or fulfilling contractual obligations to the Pistiolis-related entities were anything but legitimate business practices.

Top Ships' disclosure about potential uses of the CPSA proceeds might be broad, but it is for that very reason that the prospectus supplement put plaintiffs on notice that defendants had broad discretion to use funds, and "general corporate purposes" fairly includes the payment of salaries and money owed under business contracts – all of which plaintiffs knew about at the time.

The facts included in the complaint demonstrate that Top Ship's day-to-day operations were managed almost exclusively by Pistiolis-related entities.  Thus, there is no plausible inference here that this disclosure was misleading, or that it did not clearly allow for defendants

to use the money from the Kalani agreement to pay Pistiolis's salary or his companies through their outstanding business contracts to run the company.[10]

Plaintiffs further allege that the prospectus supplement also violated Items 303, 503, and 508 of SEC Regulation S–K.  This is unactionable for the same reasons just described.

Plaintiffs have thus failed to adequately allege that the prospectus statement was false or misleading.

### C.  The February 2, 2017 Kalani CSPA

Plaintiffs allege that the CSPA between Top Ships and Kalani attached to the Form 6-K that defendants filed on February 2, 2017 was false or materially misleading for the same seven reasons listed above with respect to the registration statements.[11]  Those reasons remain unpersuasive.  There is simply no fact in the complaint that allows for an inference that defendants knew or should have known what plaintiffs assert they did with respect to future conduct.

Moreover, the disclosure in the CSPA that defendants did not engage and did not intend to engage in any conduct that would manipulate the price of Top Ships securities is not misleading.  As explained above, there is no support for the contention that defendants engaged in a scheme to manipulate the market price of Top Ships securities.

Plaintiffs also allege that the statement that the CSPA was subject to a floor price of $0.50 was illusory considering defendants' intention to effect reverse stock splits or lower the

---

[10] This is true even though Pistiolis or his related entities hardly owned any common stock but still had voting control over the company.  Plaintiffs do not challenge the legitimacy of these corporate transactions themselves, so they do not transform this broad disclosure that defendants would use the proceeds for any number of potential corporate purposes into a misleading statement.

[11] For the same reasons, plaintiffs assert that the four amendments to this CSPA (and their attendant prospectus supplements), which incorporate the relevant language by reference, are also false or misleading.  The outcome is the same for each.

floor price whenever Top Ships' stock approached the $0.50 floor price.  But again, plaintiffs

cannot point to anything other than the fact that defendants later effected reverse stock splits to

support this inference.  And their argument is further belied by the fact that plaintiffs voted to

give the Board authority to effect the reverse stock splits that they now challenge.

Thus, nothing was misleading in or omitted from the Kalani CSPA.

### D.  The February 21, 2017 Form 6-K, Xanthe SPA, and Statement of Designations

Plaintiffs allege that the February 21, 2017 Form 6-K, which attached the SPA with

Xanthe, was false or materially misleading for the same seven reasons listed above with respect

to the registration statements.  Once again, those reasons are not persuasive or borne out in the

record.

Plaintiffs challenge the statement in the SPA that Top Ships "understands and

acknowledges that the number of Conversion Shares will increase in certain circumstances."

Their issue seems to be with the latter qualification – that this will happen in certain

circumstances (as opposed to consistently).  But plaintiffs do not explain how this is misleading.

Assuming that this is a parallel argument to the "may" vs. "will" argument plaintiffs make

above, it is not persuasive for the same reasons.  This disclosure alerted plaintiffs to the fact that

the number of shares would increase, and it by no means suggests that the number of shares

increased in a way that plaintiffs were not or should not have been expecting.

The SPA also made various warrants and representations, including that no party has

taken any action designed to manipulate Top Ships' stock price, that Top Ships does not have

any agreement with the purchaser other than the agreement contained in the documents, and that

the purchaser is purchasing the shares for its own account and not with an eye towards resale in

violation of the Securities and Exchange Act of 1933.  But for the same reason as above,

plaintiffs can show nothing other than subsequent conduct to suggest – in hindsight – that

defendants knew they would engage in that subsequent conduct when they entered into the SPA and filed it publicly.

Plaintiffs also challenge the fact that defendants omitted that the purchaser was Xanthe – specifically, that defendants omitted the fact that the purchaser was an entity affiliated with Kalani.  Plaintiffs state that without the knowledge that the purchaser was affiliated with Kalani, shareholders were given the false impression that a "serious institutional investor" was investing in Top Ships for its own portfolio.  But the force of this allegation rests on the assumption that Kalani was not a serious institutional investor.  That, in turn, relies upon the assumption that Kalani was not a bona fide purchaser but instead a market manipulator.  As explained above, the facts included in the complaint do not allow for that inference.

Moreover, defendants disclosed in the 2016 Annual Report filed less than one month later that the purchaser was a company affiliated with Kalani.  Although plaintiffs allege that this is a materiality issue, which is not properly considered at the pleadings stage, plaintiffs miss the point that this fact contradicts their asserted reasoning behind why this alleged omission was misleading in the first place: the complaint states that without the information that the purchaser was affiliated with Kalani, there was no way for shareholders to be able to connect the SPA to the ongoing fraudulent and manipulative pricing scheme.  But again, that assumes the truth of a scheme to manipulate the market, which is inappropriate based on plaintiffs' complaint, so there is nothing to suggest that this omission was misleading.

Plaintiffs also allege that the Statement of Designations filed the same day (which included the SPA's basic terms) was false or materially misleading because it stated that Top Ships "shall use the proceeds from the sale of the Securities for general corporate purposes." For the same reasons explained above, this disclosure is not misleading based on the facts in the

record about Top Ships' legitimate business practice of contracting with Pistiolis-related entities for corporate operations.

Finally, plaintiffs challenge the fixed conversion price of $3.75, alleging that it gave investors the false impression that Top Ships stock was worth that amount, and further challenge the floor price as illusory in light of the parties' intent to execute reverse stock splits once the stock price fell below the floor. Here, too, plaintiffs can only plead in hindsight. Because the stock price never made it that high, and because the Board later effected reverse stock splits, plaintiffs assume that defendants knew all of this in advance. But an assumption cannot substitute for facts, especially not in an action for fraud.

Plaintiffs have therefore failed to state a claim for securities fraud based on the Xanthe SPA and its related filings.

### E.  *Reverse Stock Splits*

Plaintiffs allege that defendants made several false or materially misleading statements related to the reverse stock splits. For example, the Form 6-K that Top Ships filed on March 6, 2017 announcing the March 24, 2017 special meeting of the shareholders to vote on the proposal attached the notice to shareholders of that meeting. The shareholder notice described the proposal's purpose as increasing the per share trading value of shares to Top Ship's common stock. It also informed shareholders that any reverse stock splits would only be performed if the Board found that they were in the company's and the shareholders' best interests at the time. Moreover, each time the Board effected a reverse stock split, it incorporated the "best interest" language in its announcements.

Plaintiffs argue that these statements were false or misleading because defendants knew and failed to disclose that the reverse stock splits were not in the shareholders' best interests and further failed to disclose that they intended to continue using "repeated, deliberately-timed,

26

dilutive reverse stock splits to prop up the price of Top Ships' common stock to facilitate the dumping of additional shares into the market, thereby destroying shareholder value." Rather, according to plaintiffs, the reverse stock splits were intended to facilitate defendants' allegedly fraudulent pricing scheme.

This assumes the truth of plaintiffs' legal conclusion, however: that defendants manipulated the Top Ships market. Without supporting facts, this claim is not actionable.

Plaintiffs also contend that once Top Ships issued the Series D preferred stock to Pistiolis on May 8, 2017, these announcements were misleading because although they mentioned the Series D issuance, the announcements failed to explain that Pistolis would singlehandedly control the vote. Plaintiffs appear to be arguing that, because their interests are different from Pistiolis's interests (since they owned common stock and he did not), the reverse stock splits were not effected in their best interests, but rather, Pistiolis's best interests, and further, that defendants mislead them by failing to mention that Pistiolis controlled the vote of whether the Board effected the reverse stock splits in the first place (which, of course, would benefit him the most).

Plaintiffs cannot feign ignorance of the differing interests between themselves and Pistiolis. The complaint states that the 2016 Annual Report disclosed that "[t]he interests of the Lax Trust or the family of Mr. Pistiolis, [which] has the power to exert considerable influence over our actions and to effectively control the outcome of matters on which our shareholders are entitled to vote . . . [,] may be different from your interests." This report was filed before any vote happened on the reverse stock splits, and as plaintiffs acknowledge, future shareholder proxy materials that they received in connection with the votes mentioned Pistiolis's Class D shares.

In addition, plaintiffs have not adequately alleged that defendants knew at the time the reverse stock splits were effected that the reverse stock splits would not be in the best interests of the shareholders.  Indeed, the complaint suggests that the money that defendants obtained through these agreements funded day-to-day operations at Top Ships.  Without that money, there might not have been a company in which plaintiffs could invest at all.  Indeed, plaintiffs' only allegation as to why these reverse stock splits were not in their best interest is "because, in fact, the stock splits formed part of Defendants' scheme to manipulate the price of Top Ships common stock so as to enrich themselves at the expense of shareholders."

Plaintiffs simply construe what happened after the fact as suggesting that defendants intended that result all along.  Contrary to plaintiffs' assertion, the complaint does not adequately allege that defendants "knew in advance that they would use the offerings to allow the Kalani Defendants to facilitate sales at a profit and then issue reverse stock splits and ultimately depress the price of the stock, causing shareholders tremendous losses."  That is not enough to show that the reverse stock splits were false or misleading for the purpose of securities fraud: it concludes foreknowledge, it neither demonstrates nor suggests it.

### F.  2016 Annual Report

Plaintiffs allege that statements contained in defendants' 2016 Annual  Report, which was filed on March 14, 2107, were false or misleading.  Specifically, plaintiffs challenge the statements that qualify the effect of defendants' stock issuances with the word "may."  For the same reasons discussed above, these permissive but not mandatory disclosures are not misleading, since defendants later acted in accordance with those disclosures and plaintiffs do not plead any facts to suggest that defendants knew with certainty that they would.

Plaintiffs challenge the disclosures in the Annual Report about the company's working capital deficit, anticipated cash flow in 2017, and the anticipated sources of that cashflow.  But

plaintiffs do not explain why these statements were wrong or misleading, so they cannot serve as the basis for a securities fraud claim.

Plaintiffs further challenge the qualification of the differing nature of Pistiolis's interests from the shareholders in light of the strong language about avoiding any real or apparent conflicts of interest contained in the business code of conduct that the Annual Report announced the company adopted.  But these disclosures were not misleading because when the Annual Report was filed and during the year that it reviews, Pistiolis did not have the Class D preferred stock or voting control over the company, and plaintiffs do not challenge the legitimacy of defendants' contracts with Pistiolis-related entities themselves.

Consequently, there was nothing false or misleading in the 2016 Annual Report.

### G.  The Crede Form 6-Ks, CSPAs, and Prospectus Supplements

Plaintiffs challenge these filings and the statements they contain for the same reasons they challenge the Kalani filings: the prospectus supplements stated that the proceeds would be used for general corporate purposes, and disclosed that the company "may" sell shares under the agreement and that Crede "may" resell some or all of those shares.  Once again, just because defendants acted in a way in which they were permitted according to this disclosure does not mean that at the time the disclosure was made defendants knew with absolute certainty that the would act in that manner (and, for good measure, that also does not mean that the disclosure is misleading).

 In addition, the prospectus supplement disclosed that "[b]y its ownership of 100% of our Series D Preferred Stock, Lax Trust has control over our actions.  The interests of [the] Lax Trust may be different from your interests."  But here too, plaintiffs can only challenge defendants' use of the word "may."  That is not a claim for securities fraud, given the disclosure that itself was made to shareholders: that the President and CEO of the company controlled the outcome of any

shareholder vote.  The propriety of this fact (for example, whether this implicates Pistiolis's fiduciary duties) is different from whether that fact was omitted or misconstrued.  Plaintiffs' complaint concerns the latter issue and not the former, but plaintiffs simply fail to acknowledge what they were told.

### H.  Note Purchase Agreements

Plaintiffs also challenge statements made related to Top Ships' note purchase agreements with Kalani, Xanthe, and Crede, which Top Ships announced in Forms 6-K filed throughout 2017 and early 2018.  Plaintiffs claim that these statements were misleading because they announced that the proceeds of the notes would be used for "general corporate purposes."  This, of course, is not actionable for the reasons provided above.

Plaintiffs also appear to challenge these agreements as misleading because Top Ships repaid its obligations under them with the proceeds from the CSPA and SPAs with Kalani, Xanthe, and Crede.  But plaintiffs do not explain how this purportedly omitted fact contradicts the disclosure in the CSPA and SPAs that the proceeds of those transactions would go towards general corporate purposes, and certainly, repaying debt obligations counts as a corporate purpose.  Plaintiffs counter that it cannot serve a corporate purpose if it is a "sham transaction," but again, plaintiffs' only support for that characterization is their conclusion that this was all a part of a larger scheme to manipulate the market, which they have not suggested occurred.

### I.  Business Updates During Class Period

Finally, plaintiffs challenge an August 3, 2017 Form 6-K in which Top Ships described its agreements with Kalani and said that the proceeds would be used for "general corporate purposes."  The same outcome applies here as above.

Plaintiffs also challenge the disclosure that the company's financial statements could be prepared on a going concern basis because the undrawn balance under the CSPA could be used

"to fund its short term capital commitments, its commitments under operating leases and its working capital requirements."  These latter purposes, of course, are included in the broader statement that the proceeds would be used for "general corporate purposes," so there is nothing misleading about this disclosure.

Plaintiffs also challenge Pistiolis's public statements describing the company's cash flow positively and asserted that the company's business strategy was focused on further expanding its fleet of ships.  But plaintiffs have not included facts which suggest that these statements were false.  (Indeed, plaintiffs do not even explain whether they believe that these statements were false or whether they were misleading, or even whether they contained misstatements or omissions; plaintiffs simply list these as statements that defendants made without further explanation.)

Plaintiffs also challenge these statements because defendnats failed to disclose the fact that Top Ships had received a subpoena from the SEC related to offerings that Top Ships made between February and August 2017.  The fact that Top Ships had received a subpoena, however, is not related or contradictory to the statements that plaintiffs challenge.  A company can have cashflow, use funds for corporate purposes, and have a business strategy focused on expanding while being under subpoena by the SEC.  And the omission of the latter does not change in any way the nature or truth of the former.

Thus, plaintiffs have failed to identify any misstatements or omissions that give rise to a claim for securities fraud.[12]  Because plaintiffs have failed to state a claim under Rule 12(b)(6) against all defendants for a failure to plead any manipulative acts or misstatements or omissions,

---

[12] Because the pleading standard for a claim that defendants made material misstatements or omissions in violation of § 9(a)(4) of the Securities Act is virtually the same as the pleading standards for a Section 10(b) claim for misstatements or omissions, this outcome is dispositive as to both claims.

the Court need not address defendants' other arguments or their motions to dismiss based on a lack of personal jurisdiction or insufficient service of process.

### III.   Material Nonpublic Information

Plaintiffs also claim that defendants violated Section 20A of the Securities Exchange Act, which makes individuals who violate § 10(b) and Rule 10b-5 liable to contemporaneous purchasers when they "purchas[e] or sell[] a security while in possession of material, nonpublic information." 15 U.S. Code § 78t–1(a).

Because this claim is contingent upon the underlying alleged violations of § 10(b) and Rule 10b-5, plaintiffs Section 20A claim must also be dismissed.

### IV.   Leave to Amend

Plaintiffs have asked for leave to amend in the event defendants' motions to dismiss are granted. Generally speaking, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2).

Defendants argue that because plaintiffs have filed earlier iterations of the complaint at issue in this motion and have not identified what, if anything, they would include in a further amended complaint, their request for leave should be denied. Defendants argument misses the mark. Plaintiffs have not had the benefit of an earlier order on a motion to dismiss, so their next complaint would, in theory, cure the deficiencies identified in this order and allow them to move forward with the litigation.

However, the problem with granting leave to amend in this specific case is that plaintiffs challenge as secretive and manipulative something that happened out in the open. Moreover, they have included just about every relevant fact they could possibly include to the describe the events that occurred here, which they claim were fraudulent. Those facts do not establish a plausible inference of securities fraud, and because of the public nature of the conduct at issue,

there are no further facts in existence which could provide such an inference.  See Alharbi v. Miller, 368 F. Supp. 3d 527, 560 (E.D.N.Y. 2019) ("A complaint could include a wealth of specific and particular facts, which would otherwise meet the standard for plausibility, but in some instances, no amount or combination of those facts could ever give rise to a violation of law.").

Although "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)," ATSI, 493 F.3d at 108, such an exercise would be futile in this case.  Leave to amend is therefore denied.

## CONCLUSION

Accordingly, defendants' [92, 93] motions to dismiss are GRANTED.  The Clerk of Court is directed to enter judgment dismissing the case.

**SO ORDERED.**

/s/(BMC)
_____
U.S.D.J.

Dated: Brooklyn, New York
August 3, 2019

33